# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

BEVERLY ANN CLAY, et al.,

Plaintiffs-Appellants,

v.

SHRIVER ALLISON COURTLEY CO., et al.,

Defendants-Appellees.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 17 MA 0003

---

Civil Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2015 CV 2906

**BEFORE:**
Cheryl L. Waite, Gene Donofrio, Kathleen Bartlett, Judges.

---

**JUDGMENT:**
Affirmed in part. Reversed in part. Remanded in part.

---

*Atty. William Paul McGuire*
William Paul McGuire Co., L.P.A., 106 E. Market Street, Suite 705, P.O. Box 1243, Warren, Ohio 44482-1243, for Plaintiffs-Appellants

*Atty. Kurt R. Weitendorf*, and
*Atty. Todd Anthony Mazzola*, Roderick Linton Belfance, LLP, 50 S. Main Street, 10th Floor, Akron, Ohio 44308, for Defendant-Appellee Shriver Allison Courtley Company

*Atty. Morris L. Hawk*, and
*Atty. Ronald A. Rispo*, Weston Hurd LLP, The Tower at Erieview, 1301 E. Ninth Street, Suite 1900, Cleveland, Ohio 44114-1862, for Defendant-Appellee Funeral Home Services Corp.

Dated:  August 16, 2018

---

**WAITE, J.**

{¶1}   Plaintiffs-Appellants, Estate of Beverly Ann Clay (with Elmer Clay as Administrator), Lilly May Curtis, and Mary Jane Patton (collectively "Appellants"), appeal the trial court's decision to grant summary judgment in favor of Defendants-Appellees, Funeral Home Services Corp. ("FHS") and Shriver Allison Courtley, Company, aka Shriver-Allison-Courtley-Weller-King ("Shriver") in this matter, which is based on intentional infliction of emotional distress and breach of contract.

{¶2}   Appellants' lawsuit centers on conduct that occurred during both the preparation and execution of the funeral services for their mother, Rose White. Appellants have not appealed the trial court's judgment in favor of Appellees on their negligent infliction of emotional distress claims or the breach of oral contract claim against FHS.

{¶3}   For the following reasons, the judgment of the trial court is affirmed with respect to Appellants' intentional infliction of emotional distress claims against FHS and Shriver.  The breach of contract claim against Shriver, to the extent that this claim is based on an obliterated handwritten provision in the parties' contract, is also affirmed. The matter is reversed in part, however, with respect to the remainder of the breach of contract claim against Shriver.  We also affirm the trial court's decision to overrule Appellants' motion to amend their verified complaint.  This matter is remanded for trial on the breach of contract claim against Appellee Shriver.

<u>Procedural History</u>

{¶4} Originally, Appellants brought suit against three parties defendant: FHS, Shriver and a defendant named and Brian Lozano. Appellants voluntarily dismissed their original complaint after discovery was completed and summary judgment had been entered in favor of FHS and Lozano. When Appellants re-filed this action in common pleas court, Lozano was named but never served.

{¶5} Prior to voluntary dismissal, all three defendants had filed motions for summary judgment and an appeal was pending in this Court. The appeal was prematurely taken, because the trial court had not included the language making its order final and appealable. When the matter was voluntarily dismissed, we dismissed the premature appeal as well.

{¶6} When the case was re-filed, the trial court entered a stipulated order incorporating the discovery from the original complaint. The prayer for relief in Appellants' verified complaint states claims for intentional infliction of emotional distress and breach of contract, as well as "[s]uch other and additional causes of action, including but not limited to, misrepresentation, fraud, malice, intent, knowledge that the actions did cause or would cause infliction of harm or irreparable psychological effect, and such additional causes of action or equitable relief as may be determined by a jury." (11/4/15 Verified Compl., Prayer for Relief, ¶ 1-3.) In the body of the complaint, Appellants allege that they suffered severe emotional distress as a result of the intentional acts, gross negligence, negligence, and violation of professional standards of FHS and Shriver employees. (11/4/15 Verified Compl., ¶ 14.)

{¶7} Summary judgment motions were immediately re-filed. Because of the interlocutory nature of the summary judgment originally entered in favor of FHS and

Lozano, the trial court re-considered the claims against these parties, despite the fact that Lozano was never properly served.

{¶8} A motion for leave to amend the verified complaint to include a fraud claim and a motion to file surreplies were filed by Appellants after briefing on summary judgment was complete, but neither motion was addressed by the trial court. In fact, in the trial court's entry granting summary judgment in favor of Shriver the court states that no motion to amend was filed.

{¶9} It appears neither judgment entry was actually drafted by the court. Instead, they seem to be proposed entries submitted by FHS and Shriver. The FHS judgment entry is erroneously captioned "PROPOSED FINDINGS OF FACT/STATEMENT OF THE CASE." It is unclear as to the date or dates the proposed entries were submitted to the trial court, but it is probable that they were submitted prior to the filing of the motions to amend and request to file surreplies, which explains the language in one of the entries that no motion to amend the verified complaint had been filed.

## Facts

{¶10} The following facts are taken from the written discovery and deposition testimony of the parties, as well as affidavits offered in support of summary judgment.

## Rose's death

{¶11} The Appellants' mother, Rose White, suffered a massive stroke while renewing her drivers' license at the ODMV. She was ninety-three years old. After Rose was pronounced brain dead at Northside Hospital in Youngstown, Ohio, her daughters had her transferred by ambulance to the main campus of the Cleveland Clinic.

{¶12} Appellants described their mother as a spry woman, who maintained herself, her home, and her yard without assistance, despite her advanced age. They were shocked by her sudden illness. Physicians at the Cleveland Clinic confirmed Northside's prognosis, and life support was removed on July 24, 2008 at roughly 4:00 p.m.

{¶13} Within one half of an hour of her mother's death, Patton contacted Shriver and spoke to the funeral director, David Courtley. Shriver had conducted the funeral services for several members of Rose's family without incident when the funeral home was under different management.

{¶14} Patton requested that her mother's body be retrieved from the Cleveland Clinic and brought to the funeral home in Youngstown by Shriver. She also asked that she and her sisters be permitted to accompany their mother's body back to Youngstown. She told Courtley that they were unfamiliar with the Cleveland area and needed guidance to return to Youngstown. She did not request a hearse.

<u>FHS and the transportation services</u>

{¶15} Courtley contacted FHS to arrange for the transportation of the body. While the transportation services were provided by FHS, Shriver billed for the services.

{¶16} Lozano, who appears to have been an independent contractor for FHS, retrieved the body on behalf of FHS. He contacted Appellants roughly two and one-half hours after Patton's conversation with Courtley to inform them that he was detained because the vehicle he was driving got a flat tire. Lozano arrived in a family-style, maroon van at approximately 9:00 p.m. (Curtis Depo., p. 35.)

**{¶17}** Lozano collected Rose's body outside of the view of Appellants and they concede that they never saw the interior of the van. Lozano met Appellants in the parking lot of the Cleveland Clinic, where he asked Patton if she thought she could "keep up" with him on the way to Youngstown. He then traveled to Youngstown, in the rain, between 9:00 and 10:00 p.m. and at an alarmingly high rate of speed, in excess of 85 miles per hour on the interstate, weaving in and out of heavy traffic.

**{¶18}** Lozano conceded that he expressed surprise to Appellants when they arrived in Youngstown that Patton had been able to follow him. Patton responded that Lozano had missed his calling and should have been a race car driver. According to Patton's testimony, Lozano traveled approximately 76.6 miles in roughly fifty minutes.

**{¶19}** At Shriver, Lozano asked Appellants if they intended to embalm their mother. He then engaged in a heated conversation with Patton in which he emphatically expressed his opinion that embalming was unnecessary. Shortly afterward, Lozano told them that state law prohibited them from entering the embalming room, so they returned home without viewing Rose's body at the funeral home.

**{¶20}** Lozano testified that the van contained all of the equipment required for the transportation of a deceased person, and that he followed all of the required protocols. William Schaper, the owner of FHS, testified that all of the vans owned by the company were outfitted with the required equipment for the transportation of deceased persons. However, he testified that all four of the vans owned by FHS at the time were silver. (Schaper Depo., p. 17.)

<u>Shriver and the funeral service</u>

Case No. 17 MA 0003

**{¶21}** When Appellants arrived at the funeral home to make arrangements for the viewing hours and funeral service the following day, Kimberly Romanchuk, Courtley's daughter and a Shriver employee, rushed them through the decision-making process, interjecting several times that she had a thirteen year old daughter who was at home alone. When Appellants could not immediately decide on certain elements of the funeral service, Romanchuk became belligerent. Romanchuk informed them that there would not be sufficient time to print prayer cards. At one point, she asked why they wanted both afternoon and evening calling hours and whether they intended to "stand around and look at each other." (Patton Depo., pp. 115-116.)

**{¶22}** When Curtis commented about their dangerous and upsetting trip home from Cleveland, Romanchuk told her that Rose's body had been transported in a family van belonging to the driver's mother-in-law because the hearse had a flat tire. (Curtis Depo., pp. 100-102.) However, Romanchuk refused to identify Lozano as the driver.

**{¶23}** Appellants purchased a Matthews Andover maple coffin with a peach lining and a mahogany exterior. Both the exterior color and lining were important to the family. Romanchuk assured the family that the coffin was similar to the one that Rose selected for their father. They chose a peach lining because Rose disliked pink.

**{¶24}** When the arrangements were complete, Romanchuk told Appellants that they had only thirty minutes to return with Rose's clothing, otherwise the doors would be locked. She instructed certain family members to collect the clothing while the others went to the florist shop to save time.

**{¶25}** Some floral deliveries were not able to be made because there was no one at the funeral home to accept delivery. As a consequence, family and friends were forced to bring their arrangements with them to the funeral home.

**{¶26}** At the viewing, Appellants were shocked at Rose's appearance. Her hair was fanned out six to eight inches around her head on the pillow with a thick layer of hair spray, and there were hair clippings in the casket and on her gown. Family members collected the cut hair and removed it from the casket. Rose had no color and her veins were visible. They noticed visible stitching in her mouth.

**{¶27}** Rose was not lying flat in the casket; her head and right shoulder were upturned to the left. She was not wearing the bra that the family brought to the funeral home with the gown, so the outline of her breasts and nipples was visible. (Betty June Fischer Depo., p. 35.) When Romanchuk lifted the blanket to put booties on Rose's feet, Appellants discovered bruising and a bloody bandage on her right ankle.

**{¶28}** No funeral home employee visited them to offer support during calling hours. That evening after the final guests had left and when the family was taking a private moment at their mother's side, Courtley told them that it was time to leave.

**{¶29}** The following day, during the minister's eulogy at Shriver, Romanchuk began removing the cards from the floral arrangements, which she placed in a bag. She handed the bag and the funeral bill to Patton during the eulogy. She then began removing the floral arrangements. Courtley appeared and could be heard telling Romanchuk, "[d]amn it to hell, get moving, we have another funeral." (Patton Depo., p. 131.) At the conclusion of the eulogy, Courtley slammed the casket lid shut and said, "[c]an I get my damn job done here?" (Patton Depo., p. 133.)

Case No. 17 MA 0003

**{¶30}** There was no final procession before the casket for mourners. Courtley dismissed everyone including the pall bearers to their automobiles. He and another funeral employee put the casket on the gurney and took it to the hearse. After half-heartedly attempting to organize the family vehicles he was heard to say, "[t]he hell with it." He got in the hearse and left. (Patton Depo., p. 138.)

**{¶31}** There was no organized funeral procession to the cemetery. There were roughly fifteen cars, but several cars were separated from the hearse due to traffic. At the grave site, Courtley announced that he had another funeral and left before the grave-side service was concluded. No guest registry was kept by the funeral home.

<u>Allegations against FHS and Shriver</u>

**{¶32}** Appellants assert that their mother's body was misshapen as a result of Lozano's failure to properly secure it in a van that was not equipped for the transportation of a deceased person, coupled with the frantic manner in which it was transported to Youngstown. They surmise that Rose's body was left in the van overnight in the funeral home parking lot, although they have offered no evidence to support that allegation. As a consequence, Appellants contend that Lozano and FHS are liable for intentional infliction of emotional distress. They also asserted breach of an oral contract, apparently based on Appellants' request to follow Lozano back to Youngstown, Ohio, but this is not raised on appeal. Due to the behavior of Courtley and Romanchuk, as well as the sub-standard funeral services provided by Shriver, Appellants contend that Shriver is liable for intentional infliction of emotional distress and breach of contract.

**{¶33}** The contract for funeral services was executed by Beverly Ann, and signed on behalf of the funeral home by "David & Kim." The total cost of the funeral services was $10,633.04. The fee was due within one month following the execution of the contract, with a 12% per annum late fee. There is a handwritten notation at the bottom of the contract that was scratched out by Courtley. The parties stipulate that the handwritten notation stated that the contract price would be paid after Rose's house was sold. The bill was, in fact, paid several years later, after the sale of Rose's house. With the late fee, the bill totaled $13,326.73.

<u>Events following the funeral services</u>

**{¶34}** After the burial service at the cemetery was complete, Appellants complained that their mother's plot was facing the wrong direction from the rest of the family plots. Appellants decided to return to the burial site later to confirm that the casket was properly repositioned. When they arrived, cemetery workers had already used a backhoe to dig around the casket and turn it, instead of raising and repositioning it. Appellants concede that Shriver was not responsible for the incorrect positioning and repositioning of the casket at the grave site.

**{¶35}** In order to investigate the allegations in the original complaint, Rose's body was exhumed on July 14, 2014. Both Patton and Curtis were present for the disinterment. Upon exhumation, the parties discovered that the lid had collapsed and water had filled the casket, so it had to be drained before it was opened. The broken casket lid lay atop Rose's remains, which were bloated and unrecognizable because they had been completely submerged in water.

{¶36} Due to the damage to the body caused by the water and broken casket, Appellants' expert, Curtis Robinson, a funeral home director and licensed mortician, was unable to determine Appellants' claim that the face and body had been in a skewed, raised position, but he confirmed that the body had been embalmed. He noted that the funeral gown was sheer and that Rose was not wearing a bra. The wire holding her mouth closed was visible. The embalmer did not use eye caps, which was standard in the industry. Robinson ultimately concluded that the decedent's overall appearance for viewing did not meet the standard of care in the funeral home industry.

{¶37} Photographs revealed that a plate on the casket read, "York Northern Maple." (Sterling Williams Aff., ¶ 3.) In their motion to amend and also in their opposition to Shriver's motion for summary judgment, Appellants contend that Shriver defrauded them by replacing the Andover Maple casket with the peach interior they had ordered and paid for with a casket of lesser quality having a pink lining. According to Courtley's affidavit, York is a wholly-owned subsidiary of Matthews International, the marketers of the Andover Maple casket purchased by Beverly Ann. He attests that the casket in which Rose was buried is the same model number as the casket identified in the contract. (David Courtley Aff., ¶ 3-7.)

{¶38} Patton and Curtis were required to re-inter Rose's body the same day it was exhumed. Consequently, Rose was buried in a metal casket. Appellants filed a separate lawsuit against the vault manufacturer and the cemetery association in 2015. That case was voluntarily dismissed in 2016 and re-filed in 2017. Summary judgment is pending in the matter.

<u>Appellants' evidence of serious emotional distress</u>

{¶39} Beverly Ann died on February 26, 2012, roughly three and one-half years after her mother's death and five months before depositions were taken in the original case. Curtis and Patton both testified that the circumstances surrounding their mother's funeral haunted Beverly Ann for the remainder of her life and hastened her death at the age of 64.

{¶40} Beverly Ann had promised her mother that she would oversee the funeral, and she was plagued with guilt over the manner in which her mother's remains were handled. After the funeral, she could hardly function and no longer prepared meals or performed any housekeeping chores. She frequently wept over the fear that she had disappointed Rose. The night before Beverly Ann died, she cried about her mother's funeral. (Curtis Depo., pp. 137-138.)

{¶41} Medical records from Beverly Ann's primary physician, M.C. Dougherty, M.D. were offered to oppose summary judgment. Notes dated November 31, 2008 indicate that she contacted Dr. Dougherty's office due to health problems following her mother's death and she was told to take Xanax twice a day, which had been previously prescribed. (Opp. Brf. to FHS Mot. For S.J. in 11 CV 2151, Exh. 9.) Notes dated October 9, 2009 indicate that Beverly Ann exhibited stress following the deaths of her mother the previous summer and her brother within the previous year. Notes captioned "History of Present Illness" from her visit to Dr. Dougherty on July 27, 2011 read, in pertinent part:

> The patient comes in today for follow-up. She has [sic] under a lot of
> stress. Her mother and brother died and her son committed suicide. She
> and her husband are raising their 12-year-old grandson. Overall she has

been doing okay. She denies chest pain or shortness of breath. She has no medical insurance at this point. Her husband was recently called back to work. She sleeps okay at night. She doesn't know if [prescribed heart medication] is making her tired.

(Opposition Brf. to Shriver Mot. For S.J., Exh. 3.) The notes indicate that she was prescribed Xanax for situational stress.

**{¶42}** Elmer Clay, Beverly Ann's husband, testified that she cried on a daily basis, had difficulty performing household chores, would rarely dress for the day, and that she was treated for heart problems, hypertension, anxiety, and depression. However, he conceded that Beverly Ann never sought psychiatric treatment for her emotional problems. (Elmer Clay Depo., pp. 32, 64.)

**{¶43}** Curtis testified at her deposition on July 16, 2012 that she was hospitalized after her mother's death due to uncontrollable blood pressure spikes. She was prescribed medication to treat hypertension and anxiety. Curtis testified that she struggles with sleeplessness and lack of concentration, which she attributes to daily triggers that remind her of her mother's funeral. She no longer listens to music because it frequently makes her cry and she no longer wants to have a funeral when she dies. (Curtis Depo., pp. 67-70, 126-133.)

**{¶44}** Patton testified at her deposition on July 17, 2012 that she suffers from numbness in her face, which was attributed to nervousness and anxiety in 2011. She experiences anxiety, depression, nervousness, sleeplessness, and stress. She was prescribed an anti-anxiety medication. (Patton Depo., pp. 64-70.)

Case No. 17 MA 0003

{¶45} Both Patton and Curtis sought psychiatric treatment in April and May of 2015, respectively, roughly nine months after their mother's disinterment. They treated with Jessica Hart, Ph.D., who diagnosed them with posttraumatic stress disorder and depressive disorder. Dr. Hart characterized their symptoms as moderately impairing their daily functioning. Medical records reflect that both sisters saw Dr. Hart weekly or bi-weekly for roughly five months.

{¶46} Patton and Curtis described depressed moods, crying spells, feelings of anger, guilt, and loss, racing thoughts, anxiety, and difficulty sleeping after their mother's funeral, as well as an inability to stop the reoccurring image of their mother's remains following her disinterment. Dr. Hart noted that both women were tearful and emotional in recounting the funeral experience, despite the fact that seven years had passed.

{¶47} Dr. Hart attributed the sisters' PTSD and depression to "the events and experiences in the aftermath of [their] mother's passing, specifically how the family was treated by the funeral home and cemetery workers, the moving of [their] mother's body after it was placed improperly, the disinterment, and conditions of [their] mother's body due to the hole in the vault." (Emphasis deleted.) (12/13/16 J.E. (FHS), p. 6.) Dr. Hart observed that neither woman could overcome the feelings of guilt and anger stemming from their mother's funeral, or erase their final image of Rose's remains.

<u>Standard of Review</u>

{¶48} This appeal is from a trial court judgment resolving a motion for summary judgment. An appellate court conducts a *de novo* review of a trial court's decision to grant summary judgment, using the same standards as the trial court set forth in Civ.R.

56(C). *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Before summary judgment can be granted, the trial court must determine that: (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977). Whether a fact is "material" depends on the substantive law of the claim being litigated. *Hoyt, Inc. v. Gordon & Assoc., Inc.*, 104 Ohio App.3d 598, 603, 662 N.E.2d 1088 (8th Dist.1995).

{¶49} "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." (Emphasis deleted.) *Dresher v. Burt*, 75 Ohio St.3d 280, 296, 662 N.E.2d 264 (1996). If the moving party carries its burden, the nonmoving party has a reciprocal burden of setting forth specific facts showing that there is a genuine issue for trial. *Id.* at 293. In other words, when presented with a properly supported motion for summary judgment, the nonmoving party must produce some evidence to suggest that a reasonable factfinder could rule in that party's favor. *Brewer v. Cleveland Bd. of Edn.,* 122 Ohio App.3d 378, 386, 701 N.E.2d 1023 (8th Dist.1997).

{¶50} The evidentiary materials to support a motion for summary judgment are listed in Civ.R. 56(C) and include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact that

have been filed in the case. In resolving the motion, the court views the evidence in a light most favorable to the nonmoving party. *Temple*, 50 Ohio St.2d at 327.

Law

**{¶51}** The elements required to recover in a claim for intentional infliction of emotional distress are:

(1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; (2) that the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered as "utterly intolerable in a civilized community," Restatement of Torts 2d (1965) 73, Section 46, comment d; (3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and (4) that the mental anguish suffered by plaintiff is serious and of a nature that "no reasonable man could be expected to endure it," Restatement of Torts 2d 77, Section 46, comment j.

*Martin v. Wills*, 7th Dist. No. 16 MA 0091, 2017-Ohio-9382, ¶ 29, citing *Pyle v. Pyle*, 11 Ohio App.3d 31, 34, 463 N.E.2d 98 (1983).

**{¶52}** A defendant's conduct is not "extreme and outrageous" merely because it is " 'tortious or * * * criminal.' " *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 374, 453 N.E.2d 666 (1983), quoting Restatement of the Law 2d, Torts 73, Section 46, comment *d* (1965). It also is not "extreme and outrageous" simply because the defendant " 'intended to inflict emotional distress,' " or acted with malice. *Id.* at 374-375, quoting Restatement, *supra*.

Case No. 17 MA 0003

**{¶53}** In other words, " 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities' " do not constitute "extreme and outrageous" conduct. *Id.*, quoting Restatement, *supra*. The *Yeager* Court explained:

> The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam. See Magruder, Mental and Emotional Disturbance in the Law of Torts, [49] Harvard Law Review 1033, 1053 (1936).

*Id.*, quoting Restatement, *supra*. Several Ohio intermediate courts have held that the determination that conduct is "extreme and outrageous" is a question of law. *Krlich v. Clemente,* 11th Dist. No. 2015-T-0089, 2017-Ohio-7945, ¶ 26; *Jones v. Wheelersburg Local School Dist.,* 4th Dist. No. 12CA3513, 2013-Ohio-3685, ¶ 41*, citing Sturdevant v. Likely,* 9th Dist. No. 12CA0024-M, 2013-Ohio-987, ¶ 23; and *Morrow v. Reminger & Reminger Co. L.P.A.*, 183 Ohio App.3d 40, 2009-Ohio-2665, 915 N.E.2d 696, ¶ 48 (10th Dist.) (Citations omitted.)

**{¶54}** Absent an actual, contemporary physical injury, plaintiffs must establish that defendant intentionally or recklessly caused them "serious" emotional distress for plaintiffs to sustain a claim for tortious infliction of emotional distress. *Schultz v.*

*Barberton Glass Co.*, 4 Ohio St.3d 131, 136, 447 N.E.2d 109 (1983) (negligent infliction of emotional distress); *Paugh v. Hanks*, 6 Ohio St.3d 72, 451 N.E.2d 759 (1983), paragraphs one and two of the syllabus (negligent infliction of emotional distress); *Yeager*, *supra* (adopting for intentional infliction of serious emotional distress the standard established in *Paugh* that emotional injury be serious). The Supreme Court in *Paugh* explained the standard of "serious" emotional distress as follows:

> By the term "serious," we of course go beyond trifling mental disturbance, mere upset or hurt feelings. We believe that serious emotional distress describes emotional injury which is both severe and debilitating. Thus, serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case.

*Id.* at 78. "A non-exhaustive litany of some examples of serious emotional distress should include traumatically induced neurosis, psychosis, chronic depression, or phobia." *Id.*

**{¶55}** The Ohio Supreme Court has stated the need for some "guarantee of genuineness" that "insures that the mental injury is serious enough to be rendered compensable." *Id.* at 76. "[A] plaintiff in a case for intentional infliction of emotional distress must present some evidence beyond the plaintiff's own testimony that he or she has experienced emotional distress due to the defendant's actions." *Buckman-Peirson v. Brannon*, 159 Ohio App.3d 12, 2004-Ohio-6074, 822 N.E.2d 830, ¶ 56.

**{¶56}** Expert opinion is helpful in proving the genuineness of a plaintiff's claim. As the Supreme Court has observed, in a case involving the tortious infliction of

emotional distress, "expert medical testimony can assist the judicial process in determining whether the emotional injury is indeed, serious," *Paugh* at 80, and "[i]n most instances, expert medical testimony will help establish the validity of the claim of serious emotional distress." *Schultz*, *supra*, at 135.

**{¶57}** Nonetheless, expert medical testimony is not indispensable to a claim of serious emotional distress. *Uebelacker v. Cincom Sys., Inc.*, 48 Ohio App.3d 268, 276, 549 N.E.2d 1210 (5th Dist.1988). As an alternative to expert testimony, a plaintiff may submit the testimony of lay witnesses who are acquainted with the plaintiff about any "marked changes in the emotional or habitual makeup" of the plaintiff following a defendant's allegedly culpable conduct. *Paugh* at 80, see also *Barker v. Netcare Corp.*, 147 Ohio App.3d 1, 768 N.E.2d 698 (10th Dist.2001) (determining a lay witness was competent to testify regarding emotional distress damages where plaintiff's husband testified to significant changes in the plaintiff's emotions and personality after alleged tortious conduct by defendants.)

**{¶58}** A court may decide whether a plaintiff has stated a cause of action for tortious infliction of emotional distress by ruling whether the emotional injury alleged is "serious" as a matter of law. *Paugh*, *supra*. The "seriousness" of the emotional distress is decided on a case-by-case basis. *Id.* at 80.

**{¶59}** Also, a plaintiff claiming severe emotional distress must establish a "substantial causal relationship" between the cause alleged (as distinguished from other possible causes), and the claimed emotional injury suffered by the plaintiff. *Ryan v. Connor*, 28 Ohio St.3d 406, 503 N.E.2d 1379 (1986). At least one Ohio appellate court has held that expert testimony is necessary to establish causality where an emotional

distress claim is based on events following the death of another. In *Powell v. Grant Med. Ctr.*, 10th Dist. No. 01AP-754, 148 Ohio App.3d 1, 2002-Ohio-443, 771 N.E.2d 874, the Tenth District reasoned that expert testimony was required to determine whether the emotional injury alleged was the result of the postmortem injuries to the decedent's body, or from the death of the decedent. *Id.* at ¶ 20.

{¶60} Turning to the breach of contract claims, "[t]o prove the existence of a contract, a party must establish the essential elements of a contract: an offer, an acceptance, a meeting of the minds, an exchange of consideration, and certainty as to the essential terms of the contract." *Schambach v. Afford-A-Pool & Spa*, 7th Dist. No. 08 BE 15, 2009-Ohio-6809, ¶ 8, quoting *Juhasz v. Costanzo*, 144 Ohio App.3d 756, 762, 761 N.E.2d 679 (7th Dist.2001). "In order to recover on a claim of breach of contract, the plaintiff must prove (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damage or loss to the plaintiff." *Price v. Dillon*, 7th Dist. Nos. 07-MA-75, 07-MA-76, 2008-Ohio-1178, ¶ 44.

{¶61} Damages for emotional distress from a breach of contract may be recovered if the contract or the breach is of such a kind that "serious emotional disturbance" was a particularly likely result. *Kishmarton v. William Bailey Constr., Inc.*, 93 Ohio St.3d 226, 230, 754 N.E.2d 785 (2001) (emotional damages available resulting from breach of vendee and builder-vendor contract); *Stockdale v. Baba*, 10th Dist. No. 02AP-402, 153 Ohio App.3d 712, 2003-Ohio-4366, 795 N.E.2d 727, ¶ 105 (emotional damages available from breach of settlement agreement based on stalking charges); *Allen v. Lee*, 43 Ohio App.3d 31, 34, 538 N.E.2d 1073 (8th Dist.1987) (residential lease lacks special emotional significance to recover emotional damages); *Brown Deer*

*Restaurant v. New Market Corp.*, 8th Dist. No. 48910, 1985 WL 9802 (Mar. 28, 1985); 3 Restatement of the Law 2d, Contracts (1981) 149, Section 353.

**{¶62}** Comment *a* to Section 353 of the Restatement explains that, although damages for emotional disturbance are not ordinarily allowed, and difficult to prove even when they are foreseeable, there are two exceptional situations where such damages are recoverable: (1) when an emotional disturbance accompanies a bodily injury, and (2) when the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result. *Kishmarton* at 230, citing 3 Restatement of the Law 2d Contracts (1981), 149, Section 353. The comment provides that a contract for the proper disposition of dead bodies is an example of a contract where recovery of serious emotional distress damages is allowed. *Stockdale* at 104, citing 3 Restatement of the Law 2d Contracts (1981), 149, Section 353.

**{¶63}** In adopting the Restatement, the Ohio Supreme Court cited Section 16, Article I of the Ohio Constitution, which reads, in pertinent part, "every person, for an injury done him * * * shall have remedy by due course of law." *Kishmarton* at 229. Because emotional distress injuries are injuries for which the Ohio Constitution guarantees a right to a remedy, the Court recognized that it is reasonable to allow emotional distress damages caused by a breach of contract. The *Kishmarton* Court observed:

> To continue to disallow emotional distress damages unfairly exposes
> innocent persons to harm that a wrongdoer has no incentive to avoid or
> mitigate. As one commentator put it, "the breaching party to a contract
> intentionally assumed must bear the full burden of the harm caused, and

there should be no exception for emotional distress damages * * *."
Whaley, Paying for the Agony: The Recovery of Emotional Distress
Damages in Contract Actions (1992), Suffolk U.L.Rev. 935, 948.

*Id.*

### Summary Judgment Entries

**{¶64}** With respect to Appellants' claims for intentional infliction of emotional distress, the trial court found as a matter of law that the allegations against FHS and Shriver did not constitute extreme or outrageous conduct. The trial court characterized the actions of Lozano and Shriver's employees as rude and unprofessional, rather than outrageous and extreme.

**{¶65}** The trial court further concluded that Appellants failed to demonstrate any genuine issue of material fact regarding the element of serious emotional distress. Because Patton and Curtis did not seek mental health treatment until several years after the funeral and Beverly Ann never sought such treatment, the trial court found that they did not suffer serious emotional distress.

**{¶66}** Because Dr. Hart attributed the mental conditions suffered by Patton and Curtis to the circumstances surrounding not only Rose's funeral but also her disinterment, the trial court held that Appellants had failed to establish a genuine issue of material fact regarding the element of causation. The trial court reasoned that the same was true for Beverly Ann. The medical notes attributed her stress not only to the loss of her mother, but the loss of her brother, as well as her son's suicide and the pressure of raising his young son.

**{¶67}** The trial court determined that the decision by Patton and Curtis to view their mother's disinterred remains was not the natural or probable consequence of any of the alleged conduct of the employees of FHS or Shriver. The court stated that "[i]t defies logic that [Appellants], who claim to be so deeply affected by what they claim to be an unprofessional presentation of their mother for viewing at the funeral, would expose themselves to the predictably unpleasant experience of her exhumation." (12/13/16 J.E. (Shriver), p. 30.)

**{¶68}** The court also held that Appellants' claims for negligent infliction of emotional distress and breach of contract claims were barred by the two-year statute of limitations for negligence claims in Ohio. Whether the non-intentional acts were alleged in the context of a claim of infliction of emotional distress or a claim for breach of contract, the court determined that the actual nature of the allegations sounded in negligence.

**{¶69}** Assuming arguendo that the breach of contract claims against Shriver were timely filed, the trial court held that the handwritten clause on the contract (which read that the bill would be paid after Rose's house was sold) would not have prevented the penalty provision from taking effect had it not been obliterated. The plain language of the clause established only that the bill would not be paid until after the sale of Rose's house, not that the penalty provision would be suspended until the house was sold. Also, because the contract did not specify the color of the lining of the casket, the trial court concluded that no breach had occurred in that regard.

{¶70} The trial court held that Appellants' breach of oral contract claim against FHS failed as a matter of law because there was no evidence of an offer by FHS, acceptance by Appellants, or consideration exchanged between the parties.

{¶71} Finally, the trial court held that the fraud claim, raised for the first time by Appellants in their opposition to summary judgment, was not asserted in the complaint, nor had Appellants filed a motion to amend the complaint. As previously stated, a motion to amend was pending when the summary judgment entries were entered.

Analysis

ASSIGNMENT OF ERROR NO. 1

THE TRIAL COURT ERRED IN ITS FAILURE TO VIEW THE EVIDENCE (EVEN CONTROVERTED) IN THE MOST FAVORABLE LIGHT OF THE PLAINTIFF PERMITS [SIC] INCLUSION OF EVIDENCE OF INTENTIONAL CAUSATION OF SEVERE EMOTIONAL DISTRESS AND OTHER MATERIAL PROBATIVE AND DISPOSITIVE EVIDENCE.

{¶72} Appellants contend that the trial court erred when it did not consider every act alleged by Appellants and conclude that Appellees should have known that those acts would cause severe emotional distress. Rather than undertaking any independent analysis or making any independent findings, Appellants complain that the trial court adopted the findings of fact and conclusions of law proposed by Appellees in their entirety. Appellees' proposed findings of fact omitted virtually every fact advanced by Appellants. As a result, the judgment entries contain a sanitized version of the events, rather than a recitation of the facts as alleged by Appellants, which should have been credited as true on summary judgment.

Intentional Infliction of Emotional Distress - FHS

**{¶73}** Again, Lozano was never served with the re-filed complaint. Hence, the only remaining defendants were FHS and Shriver. Appellants alleged the following facts in support of their intentional infliction of emotional distress claim against FHS:

**{¶74}** Lozano, who may have been an independent contractor for FHS and not an employee, arrived in a family-style van. According to Curtis, the van was maroon. (Curtis Depo., p. 35.) Appellants never saw the interior of the van. Romanchuk told her that Rose's body had been transported in a family van belonging to the driver's mother-in-law because the hearse had a flat tire. (Curtis Depo., pp. 100-102.) Schaper testified that all four of the vans owned by FHS at the time were silver. (Schaper Depo., p. 17.)

**{¶75}** Lozano met Appellants in the parking lot of the Cleveland Clinic, where he asked Patton if she thought she could "keep up" with him on the way to Youngstown. He traveled to Youngstown, in the rain, between 9:00 and 10:00 p.m. at an alarmingly high rate of speed, in excess of 85 miles per hour on the interstate, weaving in and out of heavy traffic. Lozano expressed surprise to Appellants when they arrived in Youngstown that Patton was able to follow him. Patton told Lozano he had missed his calling and should have been a race car driver. According to Patton's testimony, Lozano traveled approximately 76.6 miles in roughly fifty minutes.

**{¶76}** At Shriver, Lozano asked Appellants if they intended to embalm their mother. He then engaged in a heated conversation with Patton in which he emphatically expressed his opinion that embalming was unnecessary. Following this, Lozano told them that state law prohibited them from entering the embalming room, and they returned home without viewing the body at the funeral home.

Case No. 17 MA 0003

**{¶77}** With respect to FHS, we find that the trial court did not err in entering summary judgment on Appellants' intentional infliction of emotional distress claim. It appears that Lozano may have been an independent contractor for FHS, not an employee, meaning that FHS may not be answerable for his behavior. Regardless, resolving facts in favor of Appellants, we review this matter under the assumption that Lozano was an FHS employee. For purposes of summary judgment, we must, then, accept that Lozano transported Rose's body in his mother-in-law's van, that he violated speed limits from Cleveland to Youngstown in a rain storm while Appellants were trying to follow him, and that he engaged in a heated debate with Patton about embalming and did not allow Appellants inside the funeral home to view their mother's body.

**{¶78}** The trial court did not consider the allegation that Lozano transported Rose in his mother-in-law's van because the trial court characterized it as speculation. However, Curtis testified that the van that transported Rose was maroon, but Schaper testified that all four of FHS's vans were silver. Moreover, the trial court ignored Curtis's testimony that Romanchuk told her that Lozano drove his mother-in-law's van because the hearse had a flat tire. The trial court should have assumed for the purposes of summary judgment that Appellants' allegation was true. On the other hand, Appellants' contention that Rose's body was left in the van overnight and that her body was misshapen because it was jostled around the van are not supported by any evidence. Lozano collected Rose's body outside the view of Appellants. They concede that they never saw the interior of the van and they left Shriver without seeing the body. Therefore, the trial court correctly found that these allegations made by Appellants mere speculation.

**{¶79}** Viewing the evidence in a light most favorable to Appellants, we cannot conclude that FHS's conduct meets the standard necessary to prove intentional infliction of emotional distress. In order to meet their burden, Appellants must offer evidence of conduct "beyond all possible bounds of decency" and "utterly intolerable in a civilized community." Restatement of Torts 2d, *supra*. Although Lozano's behavior was incredibly rude and thoughtless, it was not unendurable. Further, the record reflects that Lozano did not know that his behavior would cause severe emotional distress, as that term is defined in Ohio for the purpose of intentional infliction of emotional distress.

**{¶80}** Even assuming for the purposes of this analysis that Lozano's actions constituted extreme and outrageous conduct, Appellants cannot establish that they actually suffered severe emotional distress stemming solely from his behavior or that it was the proximate result of FHS's actions. Taking the facts alleged against FHS in isolation, Appellants have not alleged a fact pattern under which a reasonable person, normally constituted, would be unable to cope. Further, it is clear from their arguments Appellants do not isolate FHS's behavior in this regard. Appellants describe Lozano's conduct as the first in a series of events that caused them to suffer depression and PTSD. Despite the temporal proximity of Lozano's conduct to the conduct of the Shriver employees, Appellants have offered no evidence to distinguish any emotional distress suffered by them as a result of FHS's actions from any emotional distress caused by the actions of the Shriver employees. In other words, they cannot establish causation as it relates to FHS.

Case No. 17 MA 0003

**{¶81}** Accordingly, Appellants have failed to demonstrate extreme and outrageous behavior on the part of Lozano and FHS and have failed to offer sufficient evidence of severe emotional distress or a substantial causal relationship to such conduct to survive summary judgment. The trial court did not err in entering summary judgment in favor of FHS on Appellants' intentional infliction of emotional distress claim.

Intentional Infliction of Emotional Distress - Shriver

**{¶82}** Appellants alleged the following facts in support of their intentional infliction of emotional distress and breach of contract claims against Shriver:

**{¶83}** When Rose's family arrived at the funeral home to make arrangements for the viewing hours and funeral service the following day, Kimberly Romanchuk, Courtley's daughter and a Shriver employee, rushed them through the decision-making process because her daughter was home alone. When they could not immediately decide on certain elements of the funeral service, Romanchuk became belligerent. She told them there would not be sufficient time to print prayer cards. She argued about their desire for both afternoon and evening calling hours and asked if they intended to "stand around and look at each other." (Patton Depo., pp. 115-116.)

**{¶84}** When the arrangements were complete, Romanchuk told Rose's family that they had only thirty minutes to return with Rose's clothing, otherwise the doors would be locked, and ordered some family members to collect the clothing while others were told to go to the florist shop, to save time.

**{¶85}** Some floral deliveries were not able to be made because there was no one at Shriver to accept delivery. Hence, family and friends were forced to bring their arrangements with them to the funeral.

{¶86} At the viewing, Appellants were shocked at Rose's appearance. Her hair was fanned out around her head with a thick layer of hair spray, and there were hair clippings in the casket and on her gown. Family members themselves collected the cut hair and removed it from the casket. Rose had no color and her veins were visible. They noticed visible stitching in her mouth.

{¶87} Rose was not lying flat in the casket; her head and right shoulder were upturned to the left. She was not wearing the bra that the family brought to the funeral home with the gown, so the outlines of her breasts and nipples were visible. (Betty June Fischer Depo., p. 35.) When Romanchuk lifted the blanket to put booties on her feet, Appellants saw bruising and a bloody bandage on her right ankle. Appellants later discovered that the body had not been furnished "eye caps" as is standard in the industry.

{¶88} After the final guests had left, the family was trying to take a private moment at their mother's side when Courtley told them to leave.

{¶89} During the minister's eulogy the next day, Romanchuk removed the cards from the floral arrangements, handing them to Patton during the eulogy, along with the bill. She began removing the floral arrangements during the eulogy.

{¶90} Courtley told Romanchuk during the eulogy, "[d]amn it to hell, get moving, we have another funeral." (Patton Depo., p. 131.) At the conclusion of the eulogy, Courtley slammed the casket lid shut and said, "[c]an I get my damn job done here?" (Patton Depo., p. 133.) Both of these statements were overheard by others.

**{¶91}** There was no final viewing before the casket for mourners. Courtley sent everyone, including the pall bearers, to their automobiles where he and another funeral employee put the casket on the gurney and took it to the hearse.

**{¶92}** After half-heartedly attempting to organize the family vehicles, Courtley said, "[t]he hell with it," and got in the hearse and left. (Patton Depo., p. 138.)

**{¶93}** There was no organized funeral procession to the cemetery and several cars were separated from the hearse due to traffic.

**{¶94}** At the grave site, Courtley announced that he had another funeral and left before the side service was concluded. No guest registry was kept by Shriver.

**{¶95}** Despite the grossly unprofessional and insensitive behavior of Courtley and Romanchuk alleged by Appellants, we cannot conclude their behavior was so egregious that it could not be endured by a reasonable person. Even assuming for the purposes of this analysis that Shriver employees' actions constituted extreme and outrageous conduct, Appellants cannot establish that they suffered severe emotional distress or that it was the proximate result of Shriver employees' actions, alone. Despite the sensitive nature of bereavement, they have not alleged a fact pattern under which a reasonable person, normally constituted, would be unable to cope. The record shows that with the possible exception of Beverly Ann, Appellants' mental problems were not debilitating. However, Beverly Ann's medical notes do not distinguish the emotional distress she suffered as a result of the funeral services from the emotional distress resulting from the death of her brother and her son's suicide. Once again, their allegations against Shriver are seen by them as a continuum of bad events which culminated, based on their entirety, in actionable behavior. This is not the standard in

Case No. 17 MA 0003

Ohio. In other words, Appellants cannot establish in Shriver's action alone the severity of the injury required for intentional infliction of emotional distress, or the causal relationship to Shriver's employees' conduct necessary to survive summary judgment.

{¶96} In the Shriver judgment entry, the trial court determined that the emotional distress suffered by Curtis and Patton as a result of their decision to witness Rose's disinterment was not attributable to Shriver. The court opined that as Curtis and Patton chose to view their mother's remains, Shriver should not be liable for any damages resulting from that decision. To the contrary, because the decision to disinter their mother and view Rose's remains was solely in furtherance of the claims asserted in this case (including their breach of contract claims), Curtis and Patton's distress is attributable in some measure to Shriver. However, this does not alter the fact that the trial court reached the correct conclusion regarding the intentional infliction of emotional distress claim against Shriver.

{¶97} In Ohio, claims of intentional infliction of emotional distress demand a virtually insurmountable burden of proof, imposing liability solely for conduct that goes beyond all possible bounds of decency, and that is atrocious and utterly intolerable in a civilized community. The resulting emotional damages must be unendurable to a normally-constituted reasonable person and there must be a substantial causal connection to the conduct of the defendant. Even with the facts taken in a light most favorable to Appellants, they have not met that burden of proof in this case. While Appellants were party to an escalating series of extremely distressing events, even they do not attribute their emotional upheaval to the action of one or the other of the individual defendants, but rather, to the combined effects of all defendants when taken

Case No. 17 MA 0003

in a continuum. This is not the standard in Ohio. Accordingly, we affirm the entries of summary judgment in favor of FHS and Shriver on Appellants' intentional infliction of emotional distress claims. Appellants' first assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT ERRED IN ITS OPINION BY CONCLUDING THE ACTIONS OF SHRIVER EMPLOYEES ARE NOT INTENTIONAL NOR EXTREME AND OUTRAGEOUS.

**{¶98}** While Appellants seem to focus on the behavior of Shriver employees in this assignment, they partially again attack certain portions of the trial court's decision to grant summary judgment on their intentional infliction of emotional distress claim: (1) failure to properly construe Dr. Hart's expert opinion; (2) imputation of liability on Appellants for attending their mother's disinterment; (3) application of the statute of limitations in R.C. 2305.10 resulting in the dismissal of the breach of contract claim against Shriver; (4) misrepresentation regarding the color of the casket lining and the obliteration of the contract provision resulting, and (5) the conclusion that the fraud claim was raised for the first time in Appellants' opposition to summary judgment. Because the elements of the intentional infliction of emotional distress claims were addressed in their entirely in the first assignment of error, only those allegations and arguments regarding their breach of contract and fraud claims will be addressed, here.

## Breach of Contract - Shriver

**{¶99}** The trial court concluded that both Appellants' negligent infliction of emotional distress and breach of contract claims against Shriver were time barred. This is because the trial court held that the Appellants' allegations regarding breach actually

were claims of negligence, and so the longer limitations period for contract actions did not apply. R.C. 2305.10 provides, in pertinent part:

> (A)  Except as provided in division (C) or (E) of this section, an action based on a product liability claim and an action for bodily injury or injuring personal property shall be brought within two years after the cause of action accrues. Except as provided in divisions (B)(1), (2), (3), (4), and (5) of this section, a cause of action accrues under this division when the injury or loss to person or property occurs.

**{¶100}**  Rose's body was transported from the Cleveland Clinic to Shriver on July 24, 2008. The funeral preparations and services occurred over the next few days. The original complaint was filed on June 30, 2011. Although Appellants concede that, standing alone, their negligent infliction of emotional distress claims were not timely filed, they assert that the trial court erred in dismissing the breach of contract claim against Shriver as time barred.

**{¶101}**  The statute of limitations that applies in a particular case does not depend on the form of the pleadings or the headings in the complaint, but on the actual nature of the subject matter of the complaint. *Shorter v. Neapolitan*, 179 Ohio App.3d 608, 2008-Ohio-6597, 902 N.E.2d 1061, ¶ 17 (7th Dist.), citing *Hunter v. Shenango Furnace Co.*, 38 Ohio St.3d 235, 237, 527 N.E.2d 871 (3d Dist.1988). "[W]hether a suit is brought in contract or tort, when the 'essence' of an action is wrongful harm to person or personal property, the R.C. 2305.10 statute of limitations is the appropriate one to apply." *Shorter* at ¶ 19, quoting *Ressallat v. Burglar & Fire Alarms, Inc.*, 79 Ohio App.3d 43, 49, 606 N.E.2d 1001 (1992).

Case No. 17 MA 0003

{¶102} Shriver contends that this case is on all fours with *JRC Holdings, Inc. v. Samsel Servs. Co.,* 166 Ohio App.3d 328, 2006-Ohio-2148, 850 N.E.2d 773 (11th Dist.). JRC, a rubber parts manufacturer, contracted with Samsel, an environmental remediation firm, to determine the extent of pollution resulting from JRC's use of trichloroethylene ("TCE"), an industrial degreaser, and to formulate a remediation plan acceptable to the Ohio EPA. Samsel submitted recommendations for certain measures, by letter or report, and JRC issued its standard purchase orders in reply. Samsel would then submit its standard invoice form and receive checks in payment.

{¶103} Samsel drilled several wells for the purpose of monitoring ground water contamination. In this process, it contaminated deep water on JRC's property. JRC filed an action for negligence, breach of contract, and breach of warranty based on the chemical contamination of the deep water zone. The Eleventh District held that JRC's claims were barred by the two-year statute of limitations for property damage:

> [T]he damages allegedly suffered by JRC are not contractual: they do not depend upon the loss of the benefit of JRC's bargain with Samsel, whatever that bargain included. A finding that this action sounds in contract would not entitle JRC to different damages than it might recover in tort. Such a finding would only extend the limitations period for bringing the action. All of JRC's causes of action allege exactly the same thing: that Samsel damaged JRC's real property by introducing TCE contamination into the deep-water zone through its drilling processes.

*Id.* at ¶ 20.

{¶104} Despite Shriver's contention to the contrary, the same is not true here. In addition to the emotional distress suffered by Appellants, the Appellants allege contractual damages for the loss of the benefit of Beverly Ann's bargain with Shriver for the provision of funeral services. The itemized contract contains charges for services of the funeral home director and staff in the amount of $1,825.00, plus charges for use of the facilities and merchandise. Like JRC, where the damages remain the same whether the action is contractual or tortious, the damages claimed by Appellants for emotional distress are an unintended consequence of the negligent performance of a contractual service. Unlike JRC, where the damages were in no way tied to the "benefit of the bargain" between JRC and Samsel, Appellants seek damages independent of the emotional damages suffered as a result of the Shriver employees' performance under the contract.

{¶105} Despite our conclusion that Appellants' breach of contract claim is not based on negligence and is not subject to the statute of limitations for tortious conduct, we nonetheless conclude that the Estate may attempt to additionally prove emotional damages that logically arose from this breach of contract claim. Although the Ohio Supreme Court has recognized that emotional damages flowing from a breach of contract are difficult to prove, even when foreseeable, they are available when the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result. *Kishmarton*, *supra*. Further, unlike the burden of proof for intentional infliction of emotional distress claims, the emotional damages resulting from a breach of contract need not be severe.

**{¶106}** Accordingly, this record reflects that the Estate's breach of contract claim is not grounded in tort. Hence, this claim is not barred by the statute of limitations found in R.C. 2305.10. This record also reflects that genuine issues of material fact exist with respect to the breach of contract claim. As earlier discussed, Appellants have alleged a plethora of facts that, if true, tend to show that they did not receive the benefit of their bargain and did not receive the goods or services for which they contracted. While the trial court ruled otherwise, it appears that the exhumation, done in preparation for suit, also revealed facts pertinent to the breach of contract claims. Further, the loss of their contractual bargain and the ensuing preparation for lawsuit may have consequently caused serious emotional disturbance, and the standard for proving this emotional damage is lower than that utilized in reviewing Appellants' intentional infliction of emotional distress claims. Therefore, summary judgment on this claim should not have been entered.

**{¶107}** Not all of Appellants' contractual claims are valid, however. Turning to the specific issue of the obliterated handwritten clause in the contract, the construction of written contracts is a matter of law. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph one of the syllabus. The purpose of contract construction is to discover and give effect to the parties' intent, which is presumed to reside in the contractual language they chose to use. *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313, 667 N.E.2d 949 (1996). Common words in a written contract will be given their ordinary meaning unless manifest absurdity results or unless some other meaning is clearly evidenced from the face or overall content of the contract. *Alexander*, paragraph two of the syllabus. If language in a contract is clear

and unambiguous, the court cannot create a new contract by finding an intent not expressed in the clear language employed by the parties. *Id.* at 246. If the contract is clear and unambiguous, its interpretation is a matter of law, and there is no issue of fact to determine. *Inland Refuse Transfer Co. v. Browning–Ferris Industries of Ohio, Inc.*, 15 Ohio St.3d 321, 322, 474 N.E.2d 271 (1984), citing *Alexander*. However, where the contract language is reasonably susceptible of more than one interpretation, the meaning of the ambiguous language becomes a question of fact. *Ohio Historical Soc. v. Gen. Maint. & Eng. Co.*, 65 Ohio App.3d 139, 146, 583 N.E.2d 340 (10th Dist.1989).

{¶108} There is no dispute that the executed contract contained a handwritten clause and that it was later obliterated by Courtley. It is also undisputed that this clause stated that payment of Rose's funeral bill would be made after the sale of her house. However, and regardless of Courtley's actions, the plain and unambiguous language of the clause did not suspend application of the penalty provision in the contract. Instead, it merely explained the condition precedent to payment. Because the handwritten clause did not suspend the penalty provision, Appellants' breach of contract claim, to the extent that it was based on the handwritten clause, was properly dismissed as a matter of law.

Motion to Amend to Include a Fraud Claim

{¶109} Appellants contend that their fraud claim was raised in the verified complaint. Fraud must be pled with particularity pursuant to Civ.R. 9(B), which provides:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

{¶110} In the complaint, a plaintiff must state the time, place and content of the false representation, the fact misrepresented, and what was obtained or given as a consequence of the fraud. The plaintiff must allege, at a minimum, the time, place and contents of the misrepresentation on which they relied. Generally, the pleadings must be sufficiently particular to apprise the opposing party of the claim against him or her. *Haddon View Investment Co. v. Coopers & Lybrand*, 70 Ohio St.2d 154, 158-159, 436 N.E.2d 212 (1982). Moreover, failure to plead fraud with particularity results in waiver of that claim. *Allied Erecting & Dismantiling Co. v. Ohio Edison Co.*, 7th Dist. No. 10-MA-25, 2011-Ohio-2627, ¶ 39-42.

{¶111} Fraud is mentioned a single time in the verified complaint, in the final paragraph of the prayer for relief. That paragraph reads, in its entirety, "[s]uch other and additional causes of action, including but not limited to, misrepresentation, fraud, malice, intent, knowledge that the actions did cause or would cause infliction of harm or irreparable psychological effect, and such additional causes of action or equitable relief as may be determined by a jury." (11/4/15 Verified Compl., Prayer for Relief, ¶ 3.) This brief, general statement is insufficient to fulfill the requirements of Civ.R. 9(B) or to put Appellees on proper notice of a fraud claim. Further, the allegations in the verified complaint regarding the casket lining refers specifically to the breach of contract claim. (11/4/15 Verified Compl., ¶ 14-15.) This record shows that Appellants failed to plead fraud with particularity in the verified complaint.

Case No. 17 MA 0003

**{¶112}** Turning to the proposed fraud claim in their motion to amend, motions on which a trial court fails to rule prior to rendering a final judgment are to be deemed overruled on the issuance of that final judgment. *Switka v. City of Youngstown*, 7th Dist. No. 05 MA 74, 2006-Ohio-4617, ¶ 11. In their appellate brief, Appellants allege that Shriver committed fraud when it provided a York Northern Maple casket instead of the Andover Maple casket identified in the contract.

**{¶113}** Appellants filed a motion for leave to amend the verified complaint to conform to the evidence pursuant to Civ.R. 15(B) on September 8, 2016. Civ.R. 15(B) governs the amendment of pleadings "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties." Appellants relied in error on Civ.R. 15(B) because this matter had not been tried. We have previously observed that the mistaken invocation of Civ.R. 15(B) is reason alone to deny a motion to amend. *Suriano v. NAACP*, 7th Dist. No. 05 JE 30, 2006-Ohio-6131, ¶ 83.

**{¶114}** Although the language of Civ.R. 15(A) favors a liberal amendment policy, amendment is not proper where there is a showing of bad faith, undue delay or undue prejudice to the opposing party. *Hoover v. Sumlin*, 12 Ohio St.3d 1, 6, 465 N.E.2d 377 (1984). Our role is to determine whether the trial judge's decision amounts to an abuse of discretion, not whether we would have reached the same conclusion. *West v. Devendra*, 7th Dist. No. 11 BE 35, 2012-Ohio-6092, 985 N.E.2d 558, ¶ 49. "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985).

**{¶115}** According to the motion to amend, Williams attested that the York casket was of lesser quality than the Andover Northern Maple casket. There is no such averment in Williams' affidavit. Williams simply states that Rose's casket had a plate attached which read "York Northern Maple." In Courtley's affidavit, he explains that York is a wholly-owned subsidiary of Matthews International, the marketers of the Andover Maple casket purchased by Beverly Ann. He attests that the casket in which Rose was buried is the same model number as the casket identified in the contract. Appellants have offered no evidence to call into question the veracity of Courtley's statements.

**{¶116}** Williams concedes that he took the photograph of the casket on July 14, 2014, the day of Rose's disinterment. More than two years passed between Rose's disinterment and the filing on the motion to amend. The failure to timely file the motion to amend based on evidence in Appellants' possession constitutes undue delay.

**{¶117}** Finally, because the color of the casket's lining was not identified in the contract, Appellants' proposed fraud claim, to the extent that it was based on the color of the casket lining, has no merit. Appellants were aware of the color of the lining of the casket during the funeral services.

**{¶118}** Appellants did not plead fraud with particularity in the verified complaint. Further, Appellants engaged in undue delay in seeking to amend the verified complaint, and the evidence in the record does not establish the elements of fraud. Accordingly, it does not appear from this record that the trial court abused its discretion in overruling the motion to amend the verified complaint to add a fraud claim.

**{¶119}** In summary, the trial court erred in granting summary judgment on the breach of contract claim and in failing to accept facts arising from the exhumation of the deceased, except to the extent that the breach claim was based on the obliterated handwritten clause. Appellants did not plead fraud with particularity in the verified complaint and the trial court did not err in overruling the motion to amend the verified complaint. Accordingly, Appellants' second assignment of error is sustained in part and overruled in part.

Conclusion

**{¶120}** For the following reasons, the judgment of the trial court is affirmed in part with respect to the intentional infliction of emotional distress claim against FHS and the intentional infliction of emotional distress claim against Shriver. The trial court's determination as to the handwritten provision in the parties' contract is also affirmed, however, the judgment is reversed in part with respect to the remainder of the breach of contract claim against Shriver. The trial court also did not abuse its discretion when it overruled Appellants' motion to amend the verified complaint and this decision is affirmed. This matter is remanded for trial on the breach of contract claim against Shriver.

Donofrio, J., concurs.

Bartlett, J., concurs.

Case No. 17 MA 0003

For the reasons stated in the Opinion rendered herein, the Appellants' first assignment of error is overruled and their second assignment is sustained in part and overruled in part. It is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed in part and reversed in part. We hereby remand this matter to the trial court for trial on the breach of contract claim against Appellee Shriver according to law and consistent with this Court's Opinion. Costs to be taxed against the Appellees.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**