**JRC HOLDINGS, INC., f.k.a. Jet Rubber Company, Appellant,**

v.

**SAMSEL SERVICES COMPANY, Appellee.**

[Cite as *JRC Holdings, Inc. v. Samsel Servs. Co.,* 166 Ohio App.3d 328, 2006-Ohio-2148.]

Court of Appeals of Ohio,
Eleventh District, Portage County.

No. 2005–P–0028.

Decided April 28, 2006.

**330**

[redacted]

Day Ketterer Ltd. and Matthew Yackshaw, for appellant.

Smith Marshall, L.L.P., and Philip J. Weaver Jr., for appellee.

---

COLLEEN MARY O'TOOLE, Judge.

{¶ 1} Appellant, JRC Holdings, Inc., f.k.a. Jet Rubber Company ("JRC"), appeals the decision of the Portage County Court of Common Pleas granting summary judgment to appellee, Samsel Services Company ("Samsel"). We affirm in part and reverse in part and remand the matter for further proceedings.

{¶ 2} Since the 1950s, JRC and its predecessor, Jet Rubber Company, have owned land in Rootstown, Ohio, with a factory producing molded rubber parts. These parts are frequently glued to metal; trichloroethylene ("TCE") is used to degrease the metal prior to gluing. Until the early 1980s, the used TCE was dumped into a pit or drain on the factory grounds.

{¶ 3} In about 1985, Frank Brubaker, president and part owner of Jet Rubber Company, sought to sell it. A potential buyer brought in Samsel, an environmental remediation firm, to check the JRC site for pollution. Samsel discovered extensive TCE contamination in the soil at the site, as well as in the "upper" zone of the site's groundwater. The land on which JRC sits has both an upper zone of groundwater and a "deep" water zone, separated by a layer of clay of varying thickness, at a fairly shallow depth below the surface. The clay is generally considered impermeable.

{¶ 4} Due to the TCE contamination, the buyer pulled out of the deal, and Brubaker hired Samsel to discover the full extent of the pollution and to formulate a remediation plan acceptable to the Ohio EPA.

{¶ 5} It appears that the normal course whereby the parties arranged their business was for Samsel to submit recommendations for certain measures, by letter or report, and for JRC to issue its standard purchase orders in reply. Samsel would then submit its standard invoice form, and receive checks in payment. The JRC purchase orders contained the following language:

{¶ 6} "You expressly warrant that all materials and work covered by this purchase order will conform to specifications, drawings, samples, or other description furnished or specified by us and will be merchantable and of good material and workmanship and free from defect. You expressly warrant that all material and work covered by this purchase order which is your product or is in accordance with your specifications will be merchantable and of good material and workmanship and free from defect and will be fit and sufficient for the purposes intended."

{¶ 7} Samsel commenced its work by taking soil samples and drilling several monitoring wells into the upper water zone in the spring of 1986. TCE contamination was found in both the soil and upper zone water samples. In the late summer of 1986, Samsel drilled 16 more monitoring wells, half of which entered the upper water zone, and half of which entered the deep-water zone. These latter wells were intended to discover whether TCE was somehow migrating through the impermeable clay separating the two water zones. In a report dated September 24, 1986, Samsel made the following pertinent observations to JRC:

{¶ 8} "The TCE detected in the deep-water-zone wells is considered to be an unavoidable remnant of the well drilling process. Contaminated sediment and water from the shallow water zone was carried downward and emplaced during auguring and completion of the deep-water-zone wells. Contaminated clay at the bottom of the well screens and entrained in the packing sand would slowly release TCE to the water in the wells. Re-sampling of Wells # 3 and # 7 indicated a slow lowering of TCE levels in those two wells * * * Future sampling of the deep water zone should confirm a lowering of the contaminant levels back to background."

{¶ 9} After a delay resulting from the refusal of a neighboring land owner to permit drilling, a further 13 monitoring wells were drilled by Samsel in the spring of 1990, in order to trace the outer limits of the polluted area. In a report to JRC dated December 15, 1990, Samsel made these pertinent observations:

{¶ 10} "The TCE detected in the 'deep' water zone wells is considered to be an unavoidable remnant of the well drilling process. Contaminated sediment and water from the 'shallow' water zone was carried downward and emplaced during auguring and completion of the deep zone wells. * * * Resampling of the wells

emplaced in the 'deep' water zone indicates a drastic (90%) reduction of TCE levels found in those wells."

{¶ 11} In the early spring of 1991, Samsel discovered increased levels of TCE contamination in one of the deep-water zone wells, No. 13. In May 1991, Samsel informed JRC that this increased contaminant level at well No. 13 meant either that there was zone-wide pollution in the deep-water zone (contrary to Samsel's earlier assessments) or that well No. 13 had failed. Yet another well, No. 33, was drilled to determine if zone-wide TCE contamination was occurring. The results from well No. 33 indicated that it was not. Eventually, it was determined that the grouting in the "annulus"—part of the seal for well No. 13—had failed. The lab results for well No. 13 were analyzed by Samsel's laboratory on June 12, 1991. A report from Samsel, containing the information about well No. 13, was issued to JRC June 10, 1992.[1]

{¶ 12} In the spring of 1993, Samsel ceased working for JRC. On June 1, 1995, JRC filed its complaint with the trial court, alleging negligence, breach of contract, and breach of warranty, due to the TCE contamination of the deep-water zone. The initial case, Portage County Court of Common Pleas No. 95 CV 0399, was dismissed, without prejudice, on September 1, 2000. The present action was filed on August 27, 2001. Eventually, Samsel moved for summary judgment, which the trial court granted by an order and journal entry dated May 9, 2005. JRC timely noticed this appeal, making a single assignment of error:

{¶ 13} "The trial court erred to the prejudice of Plaintiff–Appellant by granting Defendant–Appellee's Motion for Summary Judgment."

{¶ 14} In order for a summary judgment to be granted, the moving party must prove that "(1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." *Mootispaw v. Eckstein* (1996), 76 Ohio St.3d 383, 385, 667 N.E.2d 1197.

{¶ 15} The Supreme Court stated in *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 296, 662 N.E.2d 264, that "the moving party bears the initial responsibility of informing the trial court of the basis for the motion, *and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim.* The 'portions of the record' to which we refer are those evidentiary materials listed in Civ.R. 56(C),

---

1. This report was submitted to JRC's attorneys prior to its submission to JRC.

such as the pleadings, depositions, answers to interrogatories, etc., that have been filed in the case." (Emphasis sic.)

{¶ 16} If the moving party satisfies this burden, then the nonmoving party has the burden pursuant to Civ.R. 56(E) to provide evidence demonstrating a genuine issue of material fact. If the nonmoving party does not satisfy this burden, then summary judgment is appropriate. Civ.R. 56(E). Appellate courts review a trial court's grant of summary judgment de novo. *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153. The *Brown* court stated that "we review the judgment independently and without deference to the trial court's determination." Id. An appellate court must evaluate the record "in a light most favorable to the nonmoving party." *Link v. Leadworks Corp.* (1992), 79 Ohio App.3d 735, 741, 607 N.E.2d 1140. Furthermore, a motion for summary judgment must be overruled if reasonable minds could find for the party opposing the motion. Id.

{¶ 17} In its judgment entry granting Samsel summary judgment, the trial court did not set forth the basis of its decision. The thrust of Samsel's motion had been that no matter how denominated by JRC, the action against Samsel was for damage to real property and was therefore subject to the four-year statute of limitations set forth at R.C. 2305.09(D). Samsel alleged that on the basis of the September 24, 1986 report and the December 15, 1990 report, JRC knew, or should have known, that Samsel's drilling was causing TCE contamination to the deep-water zone at the JRC site. Therefore, Samsel argued, the original complaint, filed on or about June 1, 1995, was outside the statute of limitations.

{¶ 18} Under its single assignment of error, JRC argues vigorously, and in many veins, against the notion that its complaint is time-barred. JRC argues that the exchanges of letters, purchase orders, invoices, and checks between itself and Samsel, over the course of their relationship, created written contract(s) between the parties. It further argues that the warranty provisions of its purchase orders submitted to Samsel constitute written, express warranties on the latter's part. The statute of limitations applicable to written instruments is, of course, 15 years. R.C. 2305.06. In support of these arguments, JRC points to the numerous decisions in which written contract provisions and warranties have been found controlling for limitation purposes in construction cases.

{¶ 19} The substance of a claim, not the form of the complaint, determines the appropriate statute of limitations. *Hunter v. Shenango Furnace Co.* (1988), 38 Ohio St.3d 235, 237, 527 N.E.2d 871; see, also, *Esposito v. Caputo,* 11th Dist. No. 2002–L–099, 2003-Ohio-1590, 2003 WL 1633857, at ¶ 17. "In other words, deciding which statute of limitations applies in any given case will depend upon the type of damages allegedly suffered by a plaintiff." *Kay v. Cleveland,* 8th Dist. No. 81099, 2003-Ohio-171, 2003 WL 125280, at ¶ 17.

{¶ 20} In the instant case, the damages allegedly suffered by JRC are not contractual: they do not depend upon the loss of the benefit of JRC's bargain with Samsel, whatever that bargain included. A finding that this action sounds in contract would not entitle JRC to different damages than it might recover in tort. Such a finding would only extend the limitations period for bringing the action. All of JRC's causes of action allege exactly the same thing: that Samsel damaged JRC's real property by introducing TCE contamination into the deep-water zone through its drilling processes. Samsel being a professional environmental remediation firm, each of JRC's causes of action must be considered as alleging tortious conduct resulting in damage to real property. Thus, the four-year limitations period prescribed by R.C. 2305.09(D) controls.

{¶ 21} Again, it must be noted that the cases relied upon by JRC involve construction, generally of houses. See, e.g., *Kishmarton v. William Bailey Constr., Inc.* (2001), 93 Ohio St.3d 226, 754 N.E.2d 785 (breach of implied warranty of workmanlike performance in new-house construction is contractual). One leading case on the matter is *Elizabeth Gamble Deaconess Home Assn. v. Turner Constr. Co.* (1984), 14 Ohio App.3d 281, 14 OBR 337, 470 N.E.2d 950. There, the First District concluded that "[e]conomic losses arising from * * * failure of architects, engineers and builders to carry out the promises set forth in their contracts with the property owners fall in the contract category." Id. at 285, 14 OBR 337, 470 N.E.2d 950. But again, in this case, the losses allegedly borne by JRC do not arise from any warranty, either express or implied, that might be gleaned from the documents in this case: they arise from the allegedly damaged real property.

{¶ 22} We believe that this conclusion comports most closely with the reasoning of the Supreme Court in *Sun Refining & Marketing Co. v. Crosby Valve & Gage Co.* (1994), 68 Ohio St.3d 397, 627 N.E.2d 552, at the syllabus, wherein the court rejected the notion that the statute of limitations for warranty actions set forth at R.C. 1302.98 controls in product-liability cases alleging damage to property:

{¶ 23} "When a sophisticated commercial buyer sues for property damage caused by an allegedly defective product, claims relating to property other than the defective product itself are controlled by the statute of limitations contained in R.C. 2305.10 for personal property and R.C. 2305.09(D) for real property."

{¶ 24} Similarly, in the instant case, one sophisticated commercial entity is suing another for real-property damage arising from the allegedly negligent provision of a professional service. R.C. 2305.09(D) controls, either as regards the property damage, or the professional service. *Esposito* at ¶ 22 (real-property damage); cf. *James v. Partin,* 12th Dist. No. CA2001-11-086, 2002-Ohio-2602, 2002 WL 1058152, at ¶ 8 (professional negligence).

{¶ 25} JRC also argues that the reports of September 24, 1986, and December 15, 1990, upon which Samsel relies to establish its statute-of-limitations defense, do not constitute proper evidentiary material for summary-judgment purposes. JRC notes that the reports are not the type of evidence mentioned in Civ.R. 56(C) and, thus, in order to be accepted for summary-judgment purposes, they needed to be authenticated and introduced via affidavit. JRC objects that the copies of the reports attached to Samsel's summary judgment motion were not complete and were not introduced by affidavit. JRC further objects that the affidavit of Samsel's president, attached to Samsel's reply brief in the summary-judgment proceedings, was insufficient under Civ.R. 56(E) and did not include the reports as attachments, as required by that rule.

{¶ 26} JRC's interpretation of Civ.R. 56 is too technical. The affidavit of Samsel's president, attached to Samsel's reply brief in the summary judgment proceedings, avers that it is made on personal knowledge and that the reports attached to Samsel's summary-judgment motion are true and authentic copies of documents created by Samsel in the course of its business. This is sufficient to meet the requirements of Civ.R. 56(E) that the affidavit be made on personal knowledge and that the documents introduced be "[s]worn or certified." *State ex rel. Corrigan v. Seminatore* (1981), 66 Ohio St.2d 459, 467–468, 20 O.O.3d 388, 423 N.E.2d 105. Furthermore, this court has previously held that documents otherwise in the record need not be attached to the affidavit. *McDonald Community Fed. Credit Union v. Presco* (Nov. 9, 1990), 11th Dist. No. 89–T–4241, 1990 WL 174146. An appropriate reference to the document will suffice. In this case, each report was attached to Samsel's summary-judgment motion and thus of record; each report was authenticated by the affidavit of Samsel's president, and reference was made in that affidavit to the summary-judgment motion. While hardly perfect, this meets the minimal criteria of Civ.R. 56(E).[2]

{¶ 27} JRC further contends that Samsel's reliance on the statute of limitations is defeated by the doctrine of equitable estoppel.

{¶ 28} " 'A prima facie case for equitable estoppel requires a plaintiff to prove four elements: (1) that the defendant made a factual misrepresentation; (2) that it is misleading; (3) [that it induced] actual reliance which is reasonable and in good faith; and (4) [that the reliance caused] detriment to the relying party.' " *Helman v. EPL Prolong, Inc.* (2000), 139 Ohio App.3d 231, 246, 743 N.E.2d 484, quoting *Doe v. Blue Cross/Blue Shield of Ohio* (1992), 79 Ohio App.3d 369, 379, 607 N.E.2d 492. The doctrine may be used to prevent the inequitable use of the statute of limitations. *Schrader v. Gillette* (1988), 48 Ohio App.3d 181,

---

2. We further note that the December 1990 report was introduced as an exhibit during the deposition of Herbert Mausser, which was filed with the trial court.

183, 549 N.E.2d 218. Some courts have held that when equitable estoppel is applied to a limitations defense, a plaintiff must show that the defendant misrepresented the length of the limitations period or promised a better settlement if the plaintiff did not bring suit. *Helman* at 246, 743 N.E.2d 484 (collecting cases). Equitable estoppel is a mixed question of law and fact and must be submitted to the jury when an evidentiary dispute exists regarding its application. *Ironton City Schools Bd. of Edn. v. Hayes, Donaldson, Wittenmyer & Partners* (June 17, 1985), 4th Dist. No. 1734, 1985 WL 11150.

{¶ 29} In this case, JRC simply cannot meet the first element of the test for equitable estoppel—a factual misrepresentation by Samsel. Whether looking at the reports of September 24, 1986, and December 15, 1990, or at the depositions filed in this case, Samsel's position is invariable: some TCE contamination of the deep-water zone occurred due to the drilling of the deep-zone monitoring wells, and this problem was self-remediating. Mausser, Samsel's supervisor for the JRC project, specifically reiterated this point in his deposition. JRC points to nothing in the evidence contradicting this. Thus, JRC cannot show that equitable estoppel defeats Samsel's limitations defense regarding TCE contamination, which may have occurred due to the drilling of the various monitoring wells.

{¶ 30} Having determined that the limitations period applicable to this case is four years, pursuant to R.C. 2305.09(D), the only real question remaining is when JRC's cause(s) of action accrued. The answer is found at *Harris v. Liston* (1999), 86 Ohio St.3d 203, 714 N.E.2d 377, paragraph two of the syllabus:

{¶ 31} "A negligence action against a developer-vendor of real property for damage to the property accrues and the four-year statute of limitations of R.C. 2305.09(D) commences to run when it is first discovered, or through the exercise of reasonable diligence it should have been discovered, that there is damage to the property."

{¶ 32} The statements contained in the September 1986 report and the December 1990 report were sufficient to put JRC on notice that TCE pollution was occurring in the deep-water zone due to Samsel's drilling activities. The original complaint in this action was not filed until June 1995. JRC's causes of action for damage to its real property due to the drilling of the wells accrued no later than its receipt of the December 1990 report. They are time-barred.

{¶ 33} The failure of well No. 13 is a different story. First suspected in the spring of 1991, it was confirmed by laboratory tests on June 12, 1991, and officially reported to JRC on June 10, 1992. This failure is, quite simply, too different in fact to be considered equally with any problem caused by Samsel's drilling. The failure caused damage to real property and is subject to the four-

year statute of limitations set forth at R.C. 2305.09(D). Since JRC filed its original complaint in this matter on June 1, 1995, this cause of action is timely.

{¶ 34} Samsel has argued that JRC cannot apportion its damages between TCE contamination resulting from drilling procedures, which are no longer actionable, and the failure of well No. 13. This remains to be proven in the trial court.

{¶ 35} The trial court's grant of summary judgment to Samsel is affirmed, insofar as it relates to JRC's claims sounding in contract and warranty, or damages to JRC's real property occurring due to the process of drilling the monitoring wells. It is reversed, and the cause is remanded regarding JRC's claims resulting from the failure of well No. 13.

{¶ 36} The decision of the Portage County Court of Common Pleas, is affirmed in part and reversed in part, and the matter is remanded for further proceedings consistent with this opinion.

Judgment accordingly.

FORD, P.J., and RICE, J., concur.