[Cite as *Clay v. Shriver Allison Courtley, Co.*, 2021-Ohio-538.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

### BEVERLY ANN CLAY ET AL.,

Plaintiffs-Appellants,

v.

### SHRIVER ALLISON COURTLEY, COMPANY, A.K.A SHRIVER-ALLISON-COURTLEY-WELLER-KING FUNERAL HOME ET AL.,

Defendants-Appellees.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 20 MA 0039**

---

Civil Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2015 CV 2906

**BEFORE:**
David A. D'Apolito, Gene Donofrio, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. William McGuire,* William Paul McGuire Co., L.P.A, Chase Tower, Suite 705, 106 East Market Street, P.O. Box 1234, Warren, Ohio 44482, for Plaintiffs-Appellants and

*Atty. Lawrence Bach, and Atty. Tod Mazzola,* Roderick Linton Belfance, LLP, 50 South Main Street, 10th Floor, Akron, Ohio 44308, for Defendants-Appellees.

Dated: February 24, 2021

---

**D'Apolito, J.**

{¶1} Plaintiffs-Appellants, Estate of Beverly Ann Clay (with Elmer Clay as Administrator)("Estate"), Mary Jane Patton, and Lily May Curtis appeal the judgment entry of the Mahoning County Court of Common Pleas entering summary judgment in favor of Defendant-Appellee Shriver Allison Courtley Company aka Shriver-Allison-Courtley-Weller-King ("Shriver") and against Patton and Curtis on the breach of contract claim, and in favor of Shriver and against the Estate on the Estate's request for punitive damages.

{¶2} In their verified complaint, Appellants asserted claims for breach of contract, intentional and negligent infliction of emotional distress, and fraud based on the alleged conduct of Shriver's employees during the preparation and execution of funeral services for Appellants' mother, Rose White. Appellants also asserted emotional distress claims against Funeral Home Services ("FHS"), the company that transported Rose's body from the Cleveland Clinic to the funeral home. The trial court entered summary judgment on all of Appellants' claims. Relevant to this appeal, the trial court held that the breach of contract claim was actually a negligence claim and was barred by the applicable statute of limitations.

{¶3} Appellants appealed the entry of summary judgment on their breach of contract and intentional infliction of emotional distress claims, and, on August 16, 2018, we reversed the trial court's decision solely on the breach of contract claim. *Clay v. Shriver Allison Courtley Co.*, 7th Dist. Mahoning No. 17 MA 0003, 2018-Ohio-3371, 118 N.E.3d 1027, ¶ 106, reconsideration denied, 7th Dist. Mahoning No. 17 MA 0003 2018-Ohio-5406, ¶ 1, appeal not allowed sub nom. *Clay v. Shriver Allison Courtly Co.*, 155 Ohio St.3d 1422, 2019-Ohio-1421, 120 N.E.3d 868, ¶ 1 (2019), and appeal not allowed, 154 Ohio St.3d 1510, 2019-Ohio-601, 116 N.E.3d 1289, ¶ 1 (2019) ("*Clay* I"). Further, although emotional damages are generally not recoverable in a breach of contract action, we held that emotional damages are recoverable here, as a contract for funeral services "is of such a kind that serious emotional disturbance was a particularly likely result." *Clay* at ¶ 61-62, citing *Kishmarton v. William Bailey Contr. Inc.*, 93 Ohio St.3d226, 230, 754

N.E.2d 785 (2001). We predicated our conclusion that emotional damages are recoverable on a breach of contract claim on the *Kishmarton* Court's citation to the Restatement of Contracts, which provides that a contract for the disposition of dead bodies is an example of a contract where recovery for serious emotional distress is allowed. *Id.* Accordingly, the breach of contract claim was remanded for trial.

**{¶4}** On remand, Shriver filed a motion for partial summary judgment predicated upon a judgment entry issued by the Mahoning County Court of Common Pleas in *Mary Jane Patton v. Fithian Wilbert Burial Vault Co.,* No 2017-CV-1793 ("*Fithian* case"). In the judgment entry, the trial court dismissed a breach of contract claim based on the same funeral services contract in this appeal, because Patton and Curtis were not signatories to the contract.

**{¶5}** In the partial motion for summary judgment, Shriver argued that the remaining breach of contract claim belonged exclusively to the Estate, because the contract for funeral services was executed between Beverly Ann and Shriver. In other words, Shriver argued that Patton and Curtis had no standing to assert the breach of contract claim and were no longer parties to the lawsuit, because the intentional and negligent infliction of emotional distress claims had been dismissed. Next, Shriver argued that the Ohio Supreme Court in *Lucarell v. Nationwide Mutual Insurance Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, 97 N.E.3d 457 held that punitive damages are not available in a breach of contract claim.

**{¶6}** The trial court granted the partial motion for summary judgment, finding that Patton and Curtis did not have standing to assert the breach of contract claim, and further found that punitive damages are not recoverable on a breach of contract claim. For the following reasons, the judgment entry of the trial court is affirmed in its entirety.

## STANDARD OF REVIEW

**{¶7}** This appeal is from a trial court judgment resolving a motion for summary judgment. An appellate court conducts a de novo review of a trial court's decision to grant summary judgment, using the same standards as the trial court set forth in Civ.R. 56(C). *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). "Before summary judgment can be granted, the trial court must determine that: (1) no genuine

issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party." *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977).

{¶8}   "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." (Emphasis deleted.)  *Dresher v. Burt*, 75 Ohio St.3d 280, 296, 662 N.E.2d 264 (1996).   If the moving party carries its burden, the nonmoving party has a reciprocal burden of setting forth specific facts showing that there is a genuine issue for trial.  *Id.* at 293.   In other words, when presented with a properly supported motion for summary judgment, the nonmoving party must produce some evidence to suggest that a reasonable factfinder could rule in that party's favor.  *Doe v. Skaggs*, 7th Dist. Belmont No. 18 BE 0005, 2018-Ohio-5402, ¶ 11.

{¶9}   The evidentiary materials to support a motion for summary judgment are listed in Civ.R. 56(C) and include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact that have been filed in the case.   In resolving the motion, the court views the evidence in a light most favorable to the nonmoving party.  *Temple*, 50 Ohio St.2d at 327.

## FACTS AND PROCEDURAL HISTORY

{¶10}  The following facts are taken from the written discovery and deposition testimony of the parties, as well as affidavits offered in support of summary judgment.

### ROSE'S DEATH

{¶11}  Rose suffered a massive stroke while renewing her drivers' license at the Ohio Department of Motor Vehicles. She was ninety-three years old. After Rose was pronounced brain dead at Northside Hospital in Youngstown, Ohio, Appellants had her transferred by ambulance to the main campus of the Cleveland Clinic.

**{¶12}** Appellants described their mother as a spry woman, who maintained herself, her home, and her yard without assistance, despite her advanced age. They were shocked by her sudden incapacitation. Physicians at the Cleveland Clinic confirmed Northside's prognosis, and life support was removed on July 24, 2008 at roughly 4:00 p.m.

**{¶13}** Within one half of an hour of her mother's death, Patton contacted Shriver and spoke to the funeral director, David Courtley. Shriver had conducted the funeral services for several members of Rose's family without incident when the funeral home was under different management.

**{¶14}** Patton requested that her mother's body be retrieved from the Cleveland Clinic and brought to the funeral home in Youngstown by Shriver. She also asked that she and her sisters be permitted to accompany their mother's body back to Youngstown. She told Courtley that they were unfamiliar with the Cleveland area and needed guidance to return to Youngstown. She did not request a hearse.

THE TRANSPORTATION SERVICES

**{¶15}** Courtley contacted FHS to arrange for the transportation of the body. While the transportation services were provided by FHS, Shriver billed for the services.

**{¶16}** Brian Lozano, who appears to have been an independent contractor for FHS, retrieved the body on behalf of FHS. He contacted Appellants roughly two and one-half hours after Patton's conversation with Courtley to inform them that he was detained because the vehicle he was driving got a flat tire. Lozano arrived in a family-style, maroon van at approximately 9:00 p.m.

**{¶17}** Lozano collected Rose's body outside of the view of Appellants and they concede that they never saw the interior of the van. Lozano met Appellants in the parking lot of the Cleveland Clinic, where he asked Patton if she thought she could "keep up" with him on the way to Youngstown. He then traveled to Youngstown, in the rain, between 9:00 and 10:00 p.m. and at an alarmingly high rate of speed, in excess of 85 miles per hour on the interstate, weaving in and out of heavy traffic.

**{¶18}** Lozano conceded that he expressed surprise to Appellants when they arrived in Youngstown that Patton had been able to follow him. Patton responded that

Lozano had missed his calling and should have been a race car driver. According to Patton's testimony, Lozano traveled approximately 76.6 miles in roughly fifty minutes.

**{¶19}** At Shriver, Lozano asked Appellants if they intended to embalm their mother. He then engaged in a heated conversation with Patton in which he emphatically expressed his opinion that embalming was unnecessary. Shortly afterward, Lozano told them that state law prohibited them from entering the embalming room, so they returned home without viewing Rose's body at the funeral home.

**{¶20}** Lozano testified that the van contained all of the equipment required for the transportation of a deceased person, and that he followed all of the required protocols. William Schaper, the owner of FHS, testified that all of the vans owned by the company were outfitted with the required equipment for the transportation of deceased persons. However, he testified that all four of the vans owned by FHS at the time were silver.

## THE FUNERAL SERVICES

**{¶21}** When Appellants arrived at the funeral home to make arrangements for the viewing hours and funeral service the following day, Kimberly Romanchuk, Courtley's daughter and a Shriver employee, rushed them through the decision-making process, interjecting several times that she had a thirteen-year-old daughter who was at home alone. When Appellants could not immediately decide on certain elements of the funeral service, Romanchuk became belligerent. Romanchuk informed them that there would not be sufficient time to print prayer cards. At one point, she asked why they wanted both afternoon and evening calling hours and whether they intended to "stand around and look at each other." (Patton Depo., pp. 115-116.)

**{¶22}** When Curtis commented about their dangerous and upsetting trip home from Cleveland, Romanchuk told her that Rose's body had been transported in a family van belonging to the driver's mother-in-law because the hearse had a flat tire. However, Romanchuk refused to identify Lozano as the driver.

**{¶23}** Appellants purchased a Matthews Andover maple coffin with a peach lining and a mahogany exterior. Both the exterior color and lining were important to the family. Romanchuk assured the family that the coffin was similar to the one that Rose selected for their father. They chose a peach lining because Rose disliked pink.

**{¶24}** When the arrangements were complete, Romanchuk told Appellants that they had only thirty minutes to return with Rose's clothing, otherwise the doors would be locked. She instructed certain family members to collect the clothing while the others went to the florist shop to save time.

**{¶25}** Some floral deliveries were not able to be made because there was no one at the funeral home to accept delivery. As a consequence, family and friends were forced to bring their arrangements with them to the funeral home.

**{¶26}** At the viewing, Appellants were shocked at Rose's appearance. Her hair was fanned out six to eight inches around her head on the pillow with a thick layer of hair spray, and there were hair clippings in the casket and on her gown. Family members collected the cut hair and removed it from the casket. Rose had no color and her veins were visible. They noticed visible stitching in her mouth.

**{¶27}** Rose was not lying flat in the casket; her head and right shoulder were upturned to the left. She was not wearing the bra that the family brought to the funeral home with the gown, so the outline of her breasts and nipples was visible. When Romanchuk lifted the blanket to put booties on Rose's feet, Appellants discovered bruising and a bloody bandage on her right ankle.

**{¶28}** No funeral home employee visited them to offer support during calling hours. That evening after the final guests had left and when the family was taking a private moment at their mother's side, Courtley told them that it was time to leave.

**{¶29}** The following day, during the minister's eulogy at Shriver, Romanchuk began removing the cards from the floral arrangements, which she placed in a bag. She handed the bag and the funeral bill to Patton during the eulogy. She then began removing the floral arrangements. Courtley appeared and could be heard telling Romanchuk, "[d]amn it to hell, get moving, we have another funeral." (Patton Depo., p. 131.) At the conclusion of the eulogy, Courtley slammed the casket lid shut and said, "[c]an I get my damn job done here?" (Patton Depo., p. 133.)

**{¶30}** There was no final procession before the casket for mourners. Courtley dismissed everyone including the pall bearers to their automobiles. He and another funeral employee put the casket on the gurney and took it to the hearse. After half-

heartedly attempting to organize the family vehicles he was heard to say, "[t]he hell with it." He stepped in the hearse and departed for the cemetery. (Patton Depo., p. 138.)

{¶31} There was no organized funeral procession to the cemetery. There were roughly fifteen cars, but several cars were separated from the hearse due to traffic. At the grave site, Courtley announced that he had another funeral and left before the grave-side service was concluded. No guest registry was kept by the funeral home.

## ALLEGATIONS AGAINST FHS AND SHRIVER

{¶32} Appellants asserted that their mother's body was misshapen as a result of Lozano's failure to properly secure it in a van that was not equipped for the transportation of a deceased person, coupled with the frantic manner in which it was transported to Youngstown. They surmised that Rose's body was left in the van overnight in the funeral home parking lot, although they have offered no evidence to support that allegation. As a consequence, Appellants argued that FHS was liable for intentional infliction of emotional distress. Due to the behavior of Courtley and Romanchuk, as well as the sub-standard funeral services provided by Shriver, Appellants asserted that Shriver was liable for intentional infliction of emotional distress and breach of contract.

{¶33} The contract for funeral services was executed by Beverly Ann personally, and signed on behalf of the funeral home by "David & Kim." The total cost of the funeral services was $10,633.04. The fee was due within one month following the execution of the contract, with a 12% per annum late fee. There is a handwritten notation at the bottom of the contract that was scratched out by Courtley. The parties stipulate that the handwritten notation stated that the contract price would be paid after Rose's house was sold. The bill was paid several years later after the sale of Rose's house. With the late fee, the bill totaled $13,326.73.

## EVENTS FOLLOWING THE FUNERAL SERVICES

{¶34} After the burial service at the cemetery was complete, Appellants complained that their mother's plot was facing the wrong direction from the rest of the family plots. Appellants decided to return to the burial site later to confirm that the casket was properly repositioned. When they arrived, cemetery workers had already used a

backhoe to dig around the casket and turn it, instead of raising and repositioning it. Appellants concede that Shriver was not responsible for the incorrect positioning and repositioning of the casket at the grave site.

**{¶35}** In order to investigate the allegations in the original complaint, Rose's body was exhumed on July 14, 2014. Both Patton and Curtis were present for the disinterment. Upon exhumation, the parties discovered that the lid had collapsed and water had filled the casket, so it had to be drained before it was opened. The broken casket lid lay atop Rose's remains, which were bloated and unrecognizable because they had been completely submerged in water.

**{¶36}** Due to the damage to the body caused by the water and broken casket, Appellants' expert, Curtis Robinson, a funeral home director and licensed mortician, was unable to determine Appellants' claim that the face and body had been in a skewed, raised position, but he confirmed that the body had been embalmed. He noted that the funeral gown was sheer and that Rose was not wearing a bra. The wire holding her mouth closed was visible. The embalmer did not use eye caps, which was standard in the industry. Robinson ultimately concluded that the decedent's overall appearance for viewing did not meet the standard of care in the funeral home industry.

**{¶37}** Photographs revealed that a plate on the casket read, "York Northern Maple." In their motion to amend and also in their opposition to Shriver's motion for summary judgment, Appellants contend that Shriver defrauded them by replacing the Andover Maple casket with the peach interior they had ordered and paid for with a casket of lesser quality having a pink lining. According to Courtley's affidavit, York is a wholly-owned subsidiary of Matthews International, the marketers of the Andover Maple casket purchased by Beverly Ann. He attests that the casket in which Rose was buried is the same model number as the casket identified in the contract.

**{¶38}** Patton and Curtis were required to re-inter Rose's body the same day it was exhumed. Consequently, Rose was buried in a metal casket. Appellants filed the *Fithian* case against the vault manufacturer and the cemetery association. The *Fithian* case was settled on April 15, 2020.

APPELLANTS' EVIDENCE OF SERIOUS EMOTIONAL DISTRESS

{¶39} Beverly Ann died on February 26, 2012, roughly three and one-half years after her mother's death and five months before depositions were taken in the original case. Curtis and Patton both testified that the circumstances surrounding their mother's funeral haunted Beverly Ann for the remainder of her life and hastened her death at the age of 64.

{¶40} Beverly Ann had promised her mother that she would oversee the funeral, and she was plagued with guilt over the manner in which her mother's remains were handled. After the funeral, she could hardly function and no longer prepared meals or performed any housekeeping chores. She frequently wept over the fear that she had disappointed Rose. The night before Beverly Ann died, she cried about Rose's funeral. (Curtis Depo., pp. 137-138.)

{¶41} Medical records from Beverly Ann's primary physician, M.C. Dougherty, M.D. were offered to oppose summary judgment. Notes dated November 31, 2008 indicate that she contacted Dr. Dougherty's office due to health problems following her mother's death and she was told to take Xanax twice a day, which had been previously prescribed. Notes dated October 9, 2009 indicate that Beverly Ann exhibited stress following the deaths of her mother the previous summer and her brother within the previous year. Notes captioned "History of Present Illness" from her visit to Dr. Dougherty on July 27, 2011 read, in pertinent part:

> The patient comes in today for follow-up. She has [sic] under a lot of stress. Her mother and brother died and her son committed suicide. She and her husband are raising their 12-year-old grandson. Overall she has been doing okay. She denies chest pain or shortness of breath. She has no medical insurance at this point. Her husband was recently called back to work. She sleeps okay at night. She doesn't know if [prescribed heart medication] is making her tired.

(Opposition Brf. to Shriver Mot. For S.J., Exh. 3.) The notes indicate that she was prescribed Xanax for situational stress.

Case No. 20 MA 0039

{¶42} Elmer Clay, Beverly Ann's husband, testified that she cried on a daily basis, had difficulty performing household chores, would rarely dress for the day, and that she was treated for heart problems, hypertension, anxiety, and depression. However, he conceded that Beverly Ann never sought psychiatric treatment for her emotional problems.

{¶43} Curtis testified at her deposition on July 16, 2012 that she was hospitalized after her mother's death due to uncontrollable blood pressure spikes. She was prescribed medication to treat hypertension and anxiety. Curtis testified that she struggles with sleeplessness and lack of concentration, which she attributes to daily triggers that remind her of her mother's funeral. She no longer listens to music because it frequently makes her cry and she no longer wants to have a funeral when she dies. (Curtis Depo., pp. 67-70, 126-133.)

{¶44} Patton testified at her deposition on July 17, 2012 that she suffers from numbness in her face, which was attributed to nervousness and anxiety in 2011. She experiences anxiety, depression, nervousness, sleeplessness, and stress, for which she was prescribed an anti-anxiety medication.

{¶45} Both Patton and Curtis sought psychiatric treatment in April and May of 2015, respectively, roughly nine months after their mother's disinterment. They treated with Jessica Hart, Ph.D., who diagnosed them with posttraumatic stress disorder and depressive disorder. Dr. Hart characterized their symptoms as moderately impairing their daily functioning. Medical records reflect that both sisters saw Dr. Hart weekly or bi-weekly for roughly five months.

{¶46} Patton and Curtis described depressed moods, crying spells, feelings of anger, guilt, and loss, racing thoughts, anxiety, and difficulty sleeping after their mother's funeral, as well as an inability to stop the reoccurring image of their mother's remains following her disinterment. Dr. Hart noted that both women were tearful and emotional in recounting the funeral experience, despite the fact that seven years had passed.

{¶47} Dr. Hart attributed the sisters' PTSD and depression to "the events and experiences in the aftermath of [their] mother's passing, specifically how the family was treated by the funeral home and cemetery workers, the moving of [their] mother's body after it was placed improperly, the disinterment, and conditions of [their] mother's body

due to the hole in the vault." (Emphasis deleted.) (12/13/16 J.E. (FHS), p. 6.) Dr. Hart observed that neither woman could overcome the feelings of guilt and anger stemming from their mother's funeral, or erase their final image of Rose's remains.

## SUMMARY JUDGMENT

**{¶48}** The trial court granted summary judgment in favor of Shriver and FHS on all of Appellants' claims. With respect to Appellants' claims for intentional infliction of emotional distress, the trial court found as a matter of law that the allegations against FHS and Shriver did not constitute extreme or outrageous conduct. The trial court characterized the actions of Lozano and Shriver's employees as rude and unprofessional, rather than outrageous and extreme.

**{¶49}** The trial court further concluded that Appellants failed to demonstrate any genuine issue of material fact regarding the element of serious emotional distress. Because Patton and Curtis did not seek mental health treatment until several years after the funeral and Beverly Ann never sought treatment, the trial court found that they did not suffer serious emotional distress.

**{¶50}** The trial court held that Appellants had failed to establish a genuine issue of material fact regarding the element of causation, because Dr. Hart attributed the mental conditions suffered by Patton and Curtis to the circumstances surrounding not only Rose's funeral but also her disinterment. The trial court reasoned that the same was true for Beverly Ann. The medical notes attributed her stress to the loss of her mother, the loss of her brother, her son's suicide, and the pressure of raising his young son.

**{¶51}** The trial court determined that the decision by Patton and Curtis to view their mother's disinterred remains was not the natural or probable consequence of any of the alleged conduct of the employees of FHS or Shriver. The court stated that "[i]t defies logic that [Appellants], who claim to be so deeply affected by what they claim to be an unprofessional presentation of their mother for viewing at the funeral, would expose themselves to the predictably unpleasant experience of her exhumation." (12/13/16 J.E. (Shriver), p. 30.)

**{¶52}** The court also held that Appellants' claims for negligent infliction of emotional distress and breach of contract claims were barred by the two-year statute of

limitations for negligence claims in Ohio. Whether the non-intentional acts were alleged in the context of a claim of infliction of emotional distress or a claim for breach of contract, the court determined that the actual nature of the allegations sounded in negligence.

{¶53} Assuming arguendo that the breach of contract claims against Shriver were timely filed, the trial court held that the handwritten clause on the contract (which read that the bill would be paid after Rose's house was sold) would not have prevented the penalty provision from taking effect had it not been obliterated. The plain language of the clause established only that the bill would not be paid until after the sale of Rose's house, not that the penalty provision would be suspended until the house was sold. Also, because the contract did not specify the color of the lining of the casket, the trial court concluded that no breach had occurred in that regard. Finally, the trial court held that Appellants' breach of oral contract claim against FHS failed as a matter of law because there was no evidence of an offer by FHS, acceptance by Appellants, or consideration exchanged between the parties.

## *CLAY* I

{¶54} After reviewing the record, we affirmed the entry of summary judgment by the trial court on Appellants' intentional infliction of emotional distress claims. While we agreed that the conduct alleged by Appellants was rude and thoughtless, we opined that it was not "unendurable." *Clay, supra,* ¶ 79. We further found that Appellants' evidence did not establish that the conduct of Shriver and FHS was the proximate cause of Appellants' emotional distress, because we could not parse from the record which of the parties, Shriver, FHS, or the company employed for Rose's interment, was responsible.

{¶55} In its original motion for summary judgment, Shriver argued that the breach of contract claim was, in actuality, a claim for negligence, and was barred by the statute of limitations governing negligence claims. With respect to the breach of contract claim, we opined:

> The statute of limitations that applies in a particular case does not depend on the form of the pleadings or the headings in the complaint, but on the actual nature of the subject matter of the complaint. *Shorter v. Neapolitan*,

179 Ohio App.3d 608, 2008-Ohio-6597, 902 N.E.2d 1061, ¶ 17 (7th Dist.), citing *Hunter v. Shenango Furnace Co.*, 38 Ohio St.3d 235, 237, 527 N.E.2d 871 (3d Dist.1988). "[W]hether a suit is brought in contract or tort, when the 'essence' of an action is wrongful harm to person or personal property, the R.C. 2305.10 statute of limitations is the appropriate one to apply." *Shorter* at ¶ 19, quoting *Ressallat v. Burglar & Fire Alarms, Inc.*, 79 Ohio App.3d 43, 49, 606 N.E.2d 1001 (1992).

Shriver contends that this case is on all fours with *JRC Holdings, Inc. v. Samsel Servs. Co.*, 166 Ohio App.3d 328, 2006-Ohio-2148, 850 N.E.2d 773 (11th Dist.). JRC, a rubber parts manufacturer, contracted with Samsel, an environmental remediation firm, to determine the extent of pollution resulting from JRC's use of trichloroethylene ("TCE"), an industrial degreaser, and to formulate a remediation plan acceptable to the Ohio EPA. Samsel submitted recommendations for certain measures, by letter or report, and JRC issued its standard purchase orders in reply. Samsel would then submit its standard invoice form and receive checks in payment.

Samsel drilled several wells for the purpose of monitoring ground water contamination. In this process, it contaminated deep water on JRC's property. JRC filed an action for negligence, breach of contract, and breach of warranty based on the chemical contamination of the deep water zone. The Eleventh District held that JRC's claims were barred by the two-year statute of limitations for property damage:

> [T]he damages allegedly suffered by JRC are not contractual: they do not depend upon the loss of the benefit of JRC's bargain with Samsel, whatever that bargain included. A finding that this action sounds in contract would not entitle JRC to different damages than it might recover in tort. Such a finding would only extend the limitations period for bringing the action. All of JRC's causes of action allege exactly the same thing: that Samsel damaged JRC's real property by

introducing TCE contamination into the deep-water zone through its drilling processes.

*Id.* at ¶ 20.

Despite Shriver's contention to the contrary, the same is not true here. In addition to the emotional distress suffered by Appellants, the Appellants allege contractual damages for the loss of the benefit of Beverly Ann's bargain with Shriver for the provision of funeral services. The itemized contract contains charges for services of the funeral home director and staff in the amount of $1,825.00, plus charges for use of the facilities and merchandise. Like JRC, where the damages remain the same whether the action is contractual or tortious, the damages claimed by Appellants for emotional distress are an unintended consequence of the negligent performance of a contractual service. Unlike JRC, where the damages were in no way tied to the "benefit of the bargain" between JRC and Samsel, Appellants seek damages independent of the emotional damages suffered as a result of the Shriver employees' performance under the contract.

Despite our conclusion that Appellants' breach of contract claim is not based on negligence and is not subject to the statute of limitations for tortious conduct, we nonetheless conclude that the Estate may attempt to additionally prove emotional damages that logically arose from this breach of contract claim. Although the Ohio Supreme Court has recognized that emotional damages flowing from a breach of contract are difficult to prove, even when foreseeable, they are available when the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result. *Kishmarton*, *supra*. Further, unlike the burden of proof for intentional infliction of emotional distress claims, the emotional damages resulting from a breach of contract need not be severe.

Accordingly, this record reflects that the Estate's breach of contract claim is not grounded in tort. Hence, this claim is not barred by the statute of

limitations found in R.C. 2305.10. This record also reflects that genuine issues of material fact exist with respect to the breach of contract claim. As earlier discussed, Appellants have alleged a plethora of facts that, if true, tend to show that they did not receive the benefit of their bargain and did not receive the goods or services for which they contracted. While the trial court ruled otherwise, it appears that the exhumation, done in preparation for suit, also revealed facts pertinent to the breach of contract claims. Further, the loss of their contractual bargain and the ensuing preparation for lawsuit may have consequently caused serious emotional disturbance, and the standard for proving this emotional damage is lower than that utilized in reviewing Appellants' intentional infliction of emotional distress claims. Therefore, summary judgment on this claim should not have been entered.

*Clay I, supra,* at ¶ 101-106. Accordingly, we remanded the breach of contract claim for trial.

## THE JUDGMENT ENTRY ON APPEAL

{¶56} On remand, Shriver filed a four-page motion for partial summary judgment based on a judgment entry issued in the *Fithian* case. In the judgment entry in the *Fithian* case, the trial court opined that Patton and Curtis did not have standing to sue for breach of the funeral purchase agreement, the same contract at issue in this appeal.

{¶57} In the partial motion for summary judgment, Shriver argued that the Estate was the only plaintiff with standing to assert the breach of contract claim because Beverly Ann was the only plaintiff who was a party to the contract. Shriver further argued that *Lucarell, supra,* prohibited any award of punitive damages for breach of contract.

{¶58} The trial court opined that Patton and Curtis's standing to assert the breach of contract claim was not raised in Shriver's original summary judgment motion, and, therefore, was not a matter addressed by this Court in *Clay* I. The trial court further found that neither Patton nor Curtis was a third-party beneficiary of the contract, because the face of contract did not establish that Patton and Curtis were intended beneficiaries. The

trial court expressly stated that it did not rely on the judgment entry in the *Fithian* case. Finally, the trial court found that the Ohio Supreme Court's decision in *Lucarell,* supra, prohibited an award of punitive damages on the breach of contract claim.  This timely appeal followed.

## ANALYSIS

**{¶59}** Because Appellants' arguments with respect to both of the trial court's findings are predicated upon the same theories of law, they are addressed together for the purpose of judicial economy.

## ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN ITS REFUSAL TO APPLY THE DOCTRINE OF "LAW-OF-THE-CASE"/"MANDATE" AND THE FACTS AND CONCLUSIONS OF LAW FOUND IN CLAY I AS REQUIRED BY NOLAN V. NOLAN (1984) 11 OHIO ST.3D 1.**

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT REFUSED TO FOLLOW THE LAW OF THE CASE DOCTRINE AND ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANT ON THE ISSUE OF PLAINTIFF MARY JANE PATTON AND LILY MAY CURTIS' STANDING TO SUE DEFENDANT UNDER THE FUNERAL PURCHASE AGREEMENT.**

## ASSIGNMENT OF ERROR NO. 3

**THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANT ON ISSUES THAT DEFENDANT DID NOT RAISE THAT COULD HAVE BEEN RAISED BY THE DEFENDANT (A) IN ITS MOTION FOR RECONSIDERATION, OR (B) MOTION TO CERTIFY CONFLICT, OR (C) ON DIRECT APPEAL TO THE OHIO SUPREME COURT.**

{¶60} Patton and Curtis do not argue that they are third-party beneficiaries of the funeral contract in this appeal, but, instead, that the trial court was prohibited from revisiting the issue of standing based on the law of the case doctrine. They argue in the alternative that they have standing to assert the breach of contract claim based on the rule of law announced by the Eighth District in *Biro v. Hartman Funeral Home*, 107 Ohio App.3d 508, 669 N.E.2d 65 (8th Dist.1995).

{¶61} Pursuant to the law of the case doctrine, "the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." *Nolan v. Nolan*, 11 Ohio St.3d 1, 3, 462 N.E.2d 410 (1984). That doctrine precludes a litigant from attempting to rely on arguments that were fully pursued in a prior proceeding. *Hubbard ex rel. Creed v. Sauline*, 74 Ohio St.3d 402, 404-405, 659 N.E.2d 781 (1996). "The doctrine of law of the case comes into play only with respect to issues previously determined." *Quern v. Jordan*, 440 U.S. 332, 347, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), fn. 18, citing *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 16 S.Ct. 291, 40 L.Ed. 414 (1895).

{¶62} On remand, "a trial court * * * confronted with substantially the same facts and issues as were involved in the prior appeal * * * is bound to adhere to the appellate court's determination of the applicable law," *Nolan* at 3, but that court "may consider and decide any matters left open by the mandate of [the appellate] court." *Quern* at 347, fn.18, quoting *Sanford Fork & Tool* at 256. The law of the case doctrine "is considered to be a rule of practice rather than a binding rule of substantive law and will not be applied so as to achieve unjust results." *Nolan, supra,* at 3.

{¶63} Appellants contend that we held that Patton and Curtis have standing to assert the breach of contract claim based on references in the memorandum opinion to "Appellants' breach of contract claim." In their verified complaint, Appellants do not state specific causes of action, but, instead, generally seek recovery for breach of contract, and intentional infliction of emotional distress, as well as emotional damages, for the first time in their prayer for relief. In other words, Appellants asserted the breach of contract claim as a group, and we referred to the breach of contract claim as being asserted by all three of the Appellants in *Clay* I.

**{¶64}** Shriver did not challenge Patton and Curtis's standing to assert the breach of contract claim in the original motion for summary judgment. Shriver argued that the breach of contract claim was actually a claim for negligence, and, as a consequence, it was barred by the applicable statute of limitations. We found that the breach of contract claim was not a negligence claim. However, we made no finding regarding Patton and Curtis's standing to assert the breach of contract claim. Patton and Curtis's standing were not before us in *Clay* I. Therefore, we find that the law of the case doctrine does not apply to the issue of Patton and Curtis's standing to assert the breach of contract claim.

**{¶65}** We further find that Shriver had no obligation to challenge Patton and Curtis's standing in its motion for reconsideration, or its appeal to the Ohio Supreme Court. "It is axiomatic that a party cannot raise issues for the first time on appeal that were not raised below." *Home Savings & Loan Co. v. Captiva Hong Kong Ltd.,* 7th Dist. Mahoning No. 03 MA 167, 2004-Ohio-6375, ¶ 32, citing *Stores Realty Co. v. Cleveland*, 41 Ohio St.2d 41, 43, 322 N.E.2d 629 (1975). Because the sole argument advanced by Shriver in the original summary judgment motion in *Clay* I was based on the applicable statute of limitations, Shriver was prohibited from asserting the standing argument for the first time before this Court or the Ohio Supreme Court on appeal.

**{¶66}** In the alternative, Patton and Curtis argue that they have standing to assert the breach of contract claim based on the rule of law announced by the Eighth District Court of Appeals in *Biro, supra.* In that case, the Eighth District held children have legal standing to maintain an action in tort for desecration of their parent's remains. *Id.,* citing *Carney v. Knollwood Cemetery Assn.*, 33 Ohio App.3d 31, 37, 514 N.E.2d 430, 435-436 (1986) (outrageous disturbance of remains). However, the only claim that remains in this case is a breach of contract claim, not a tort claim, therefore, *Biro* is inapposite.

**{¶67}** Insofar as Shriver did not challenge the standing of Patton and Curtis to assert the breach of contract claim in *Clay I*, we affirm the decision of the trial court declining to apply the law of the case doctrine. We further find that Shriver could not raise the issue of standing in a motion for reconsideration or in its direct appeal to the Ohio Supreme Court, but, instead, was required to raise it first to the trial court on remand. Finally, we find that Patton and Curtis do not have standing to assert the breach of

contract claim because only Beverly Ann was a party to the contract. Accordingly, Appellants' first three assignments of error are not well taken.

### ASSIGNMENT OF ERROR NO. 4

**THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANT ON THE ISSUE OF PUNITIVE DAMAGES. R.C. § 2315.21, AS THE COURT OF APPEALS OPINION AND JUDGMENT ENTRY OF 8-16-2020 [SIC] CONTAINS FINDINGS OF FACT AND CONCLUSIONS OF LAW CONSISTENT TO APPLY <u>LUCARELL V. NATIONWIDE MUT. INS. CO.</u> 152 OHIO ST.3d 453 TO THIS CASE.**

{¶68} Lucarell sued Nationwide for breach of contract, fraudulent misrepresentation, invasion of privacy, retaliation, and constructive discharge, asserting it had fraudulently and in bad faith induced her to open a new insurance agency when it intended to terminate her after she generated a profitable book of business.

{¶69} The case proceeded to trial, and at the close of her case-in-chief, the court directed a verdict in favor of Nationwide on the fraud claim. The jury returned verdicts in favor of Lucarell in excess of $42 million in compensatory and punitive damages, finding that Nationwide had breached the contracts, invaded Lucarell's privacy, retaliated against her, and constructively discharged her. The trial court, applying statutory caps on damages, entered judgment against Nationwide for more than $14 million in compensatory and punitive damages. Both parties appealed.

{¶70} We affirmed the breach of contract judgment, affirmed the invasion of privacy judgment in part, reversed the retaliation and constructive discharge judgments, and reinstated and remanded the fraud claim for a new trial. We opined that punitive damages could be awarded for breach of contract if Lucarell proved her fraud claim.

{¶71} However, the Ohio Supreme Court held that punitive damages may not be awarded for breach of contract, no matter how willful the breach. *Lucarell, supra* at ¶ 35. The Ohio Supreme Court reasoned:

This court articulated this rule almost a century ago in *Ketcham v. Miller*, 104 Ohio St. 372, 136 N.E. 145 (1922), paragraph two of the syllabus: "Punitive damages are not recoverable in an action for breach of contract."

Nonetheless, Ohio appellate courts, including the Seventh District Court of Appeals in this case, have suggested that there is an "exception" to the common law rule and that punitive damages may be awarded if a breach of contract is accompanied by a connected but independent tort. See, e.g., 2015-Ohio-5286, 44 N.E.3d 319, at ¶ 177; *Meisel v. Buildt*, 8th Dist. Cuyahoga No. 70168, 1996 WL 596451, *6 (Oct. 17, 1996); *Goldfarb v. Robb Report, Inc.*, 101 Ohio App.3d 134, 140, 655 N.E.2d 211 (10th Dist.1995).

However, this court has never recognized an exception to the common law rule precluding the award of punitive damages for breach of contract. Although we have noted that the conduct constituting a breach of contract can also constitute a tort, we have made clear that punitive damages are available only when the claimant "suffered a harm distinct from the breach of contract action and attributable solely to the alleged tortious conduct." *Shimola v. Nationwide Ins. Co.*, 25 Ohio St.3d 84, 86, 495 N.E.2d 391 (1986). Thus, punitive damages " 'are recoverable for a tort committed in connection with, but independently of, the breach of contract, where the essentials of an award of such damages are otherwise present, the allowance of such damages being for the tort and not for the breach of contract.' " *Saberton v. Greenwald*, 146 Ohio St. 414, 426, 66 N.E.2d 224 (1946), quoting 25 Corpus Juris Secundum, Damages, Section 120, at 716.

We recently applied this principle in *Sivit v. Village Green of Beachwood, L.P.*, 143 Ohio St.3d 168, 2015-Ohio-1193, 35 N.E.3d 508. In that case, a fire caused by negligent construction and maintenance destroyed an apartment building; the jury awarded the tenants punitive damages, and the trial court declined to apply the statutory cap on punitive damages provided

by R.C. 2315.21. *Sivit v. Village Green of Beachwood, L.P.*, 8th Dist. Cuyahoga No. 98401, 2013-Ohio-103, 2013 WL 177465, ¶ 66. The court of appeals affirmed, explaining that the statutory cap applies only to a "tort action," which pursuant to R.C. 2315.21(A)(1), "does not include a civil action for damages for a breach of contract or another agreement between persons." The appellate court reasoned that the cap did not apply to the tenants' award, because "Landlord-Tenant agreements are contractual in nature and injurious conduct arising out of the contract is not a tort action." *Id.* at ¶ 59.

We reversed that determination and explained that although the tenants' claims sounded both in contract and in tort, punitive damages could be awarded only for the tortious conduct, not for the breach of contract. *Sivit*, 143 Ohio St.3d 168, 2015-Ohio-1193, 35 N.E.3d 508, at ¶ 5. Thus, when a breach of contract involves conduct that also constitutes a tort, punitive damages may be awarded only for the tort, not for the breach, *Saberton* at 426, 66 N.E.2d 224, and any punitive damages awarded are subject to statutory limitations on punitive damages imposed in R.C. 2315.21, *Sivit*, 143 Ohio St.3d 168, 2015-Ohio-1193, 35 N.E.3d 508, at ¶ 5.

Accordingly, punitive damages are not recoverable for the breach of contract claims Lucarell alleged in her amended complaint, including her claim that Nationwide breached its implied contractual duty of good faith and fair dealing.

*Id.* at ¶ 35-40.

{¶72} Appellants contend that they may recover punitive damages based on a separate tort claim. However, no tort claim remains. They originally asserted a negligent infliction of emotional distress claim, but conceded in *Clay I* that it was barred by the applicable statute of limitations. Further, we affirmed the dismissal of their intentional infliction of emotional distress claims in *Clay* I. Emotional damages are recoverable in this case based on a narrow exception to the general rule prohibiting recovery of

emotional damages on a breach of contract claim, not any remaining, independent tort claim. Insofar as the breach of contract claim is the only claim that remains, we find that punitive damages are not recoverable in this case.

## CONCLUSION

{¶73} For the foregoing reasons, we find that Patton and Curtis do not have standing to assert the breach of contract claim, and that the Estate may not recover punitive damages based on the breach of contract claim. Accordingly, the judgment entry of the trial court is affirmed in its entirety.

Donofrio, P.J., concurs.

Robb, J., concurs.

Case No. 20 MA 0039

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs to be taxed against the Appellants.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**